

$4^{00}$



**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF PENNSYLVANIA**

FILED
NOV 0 6 2013
MICHAEL E. KUNZ, Clerk
By KC Dep. Clerk

| | |
|---|---|
| UNITED STATES OF AMERICA, THE STATE OF CALIFORNIA, THE STATE OF CONNECTICUT, THE STATE OF COLORADO, THE STATE OF DELAWARE, THE STATE OF FLORIDA, THE STATE OF GEORGIA, THE STATE OF ILLINOIS, THE STATE OF INDIANA, THE STATE OF LOUISIANA, THE COMMONWEALTH OF MASSACHUSETTS, THE STATE OF MICHIGAN, THE STATE OF NEVADA, THE STATE OF NEW JERSEY, THE STATE OF NEW MEXICO, THE STATE OF NORTH CAROLINA, THE STATE OF OKLAHOMA, THE STATE OF TENNESSEE, THE STATE OF TEXAS, THE COMMONWEALTH OF VIRGINIA, THE STATE OF WASHINGTON, *ex rel.* ASHOK JAIN, M.D. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |

Plaintiffs,

v.

UNIVERSAL HEALTH SERVICES, INC., ASCEND HEALTH CORPORATION, BEHAVIORAL HOSPITAL OF BELLAIRE, CEDAR HILLS HOSPITAL, THE RECOVERY CENTER, SALT LAKE BEHAVIORAL HEALTH, SCHICK SHADEL HOSPITAL, UNIVERSITY BEHAVIORAL HEALTH OF DENTON, UNIVERSITY BEHAVIORAL HEALTH OF EL PASO, VALLEY HOSPITAL, MAYHILL HOSPITAL and PSYCHIATRIC SOLUTIONS, INC.

Defendants.

**CASE NO. :** **13   6499**

**FILED UNDER SEAL**

**RELATOR'S COMPLAINT PURSUANT TO THE FEDERAL FALSE CLAIMS ACT, 31 U.S.C. §§ 3729 *ET SEQ.* AND PENDENT STATE FALSE CLAIMS ACTS**

**DEMAND FOR JURY TRIAL**



## TABLE OF CONTENTS

I.  SUMMARY OF THE ACTION.................................................................................2

II.  THE PARTIES ...............................................................................................4

III.  JURISDICTION AND VENUE ............................................................................8

IV.  THE FALSE CLAIMS ACTS .............................................................................9

V.  THE FALSE CLAIMS SCHEME ........................................................................10

  1.  Background on Payment to Inpatient Psychiatric Facilities.............................10

  2.  UHS Hospitalized Patients Did Not Meet the Medical Necessity Criteria for
      Admission. ..............................................................................................14

    a.  The Relevant Standards ......................................................................14

    b.  The Standards and Criteria for Admission Were Consistently Violated. ...........18

    c.  UHS Closely Monitored Admissions and LOS Metrics to Further Its Scheme and
        Maximize Profits. ............................................................................22

    d.  Examples of Patients Who Were Fraudulently Admitted...........................26

    e.  UHS Engaged in Unit Allocation to Further the Admissions Scheme...................28

  3.  UHS Kept Patients Hospitalized Who Met the Criteria for Discharge in order to
      Increase Patient Lengths of Stay and UHS Revenues. ...................................29

    a.  The Relevant Standards ......................................................................29

    b.  The Standards and Criteria for Discharge Were Consistently Violated To
        Maximize the LOS of Government Payor Patients. .................................31

    c.  UHS Closely Monitored LOS Metrics to Further Its Scheme and Maximize
        Profits......................................................................................39

    d.  Examples of Patients with Fraudulent Lengths of Stay...........................41

    e.  Relator Took His Concerns Directly to Bellaire and UHS Corporate
        Management. ..............................................................................42

    f.  Bellaire's Utilization Review Committee Was a Sham...........................44

  4.  UHS Corporate Was Directly Involved in Managing Admissions and Lengths
      of Stay so as to Maximize Its Profits ....................................................45

  5.  Medical Record Documentation Does Not Meet CMS Requirements and Does Not
      Support the Medical Necessity of Patient Admissions and Lengths of Stay.................47

  6.  UHS Billed For, But Did Not Provide, the Required Active Treatment ......................48

  7.  UHS Recruited Patients for Hospitalization Who Did Not Meet the Medical
      Necessity Criteria for Admission.........................................................53

  8.  UHS Caused Illegal Billings to be Submitted to Medicare Part D................54

  9.  UHS Illegally Used Chemical Restraint to Increase Patients' Lengths of Stay .............55

i

10.  UHS Admitted Patients into PHPs Who Did Not Meet the Medical Necessity Criteria for Admission. ...................................................................................................55

COUNTS ...........................................................................................................................60

1.     The relator, Ashok Jain, M.D. ("Relator"), on behalf of the United States of America, the State of California, the State of Colorado, the State of Delaware, the State of Florida, the State of Georgia, the State of Illinois, the State of Indiana, the State of Louisiana, the State of Maryland, the Commonwealth of Massachusetts, the State of Michigan, the State of Minnesota, the State of Nevada, the State of New Jersey, the State of New Mexico, the State of North Carolina, the State of Oklahoma, the State of Tennessee, the State of Texas, the Commonwealth of Virginia, and the State of Washington, (hereinafter referred to as the "Plaintiff States"), brings this action against Universal Health Services, Inc., Ascend Health Corporation, Behavioral Hospital of Bellaire, Cedar Hills Hospital, The Recovery Center, Salt Lake Behavioral Health, Schick Shadel Hospital, University Behavioral Health Of Denton, University Behavioral Health of El Paso, Valley Hospital, Mayhill Hospital and Psychiatric Solutions, Inc. for violations of the Federal False Claims Act ("FCA"), 31 U.S.C. §§ 3729 *et seq.*, and for violations of the following State False Claims Acts ("State FCAs"): The California False Claims Act, Cal. Govt. Code §§ 12650 *et seq.*; The Colorado Medicaid False Claims Act, C.R.S. §§25.5-4-303.5, *et seq.*; The Connecticut False Claims Act, Conn. Gen. Stat. §§ 17b-301b; The Delaware False Claims and Reporting Act, Del. Code Ann. Tit. 6, §§ 1201 *et seq.*; The Florida False Claims Act, Fla. Stat. §§ 68.081 *et seq.*; The Georgia False Medicaid Claims Act, Ga. Code Ann. §§ 49-4-168, *et seq.*; The Illinois Whistleblower Reward and Protection Act, 74 Ill. Comp. Stat. Ann. §§ 175/1 *et seq.*; The Indiana False Claims and Whistleblower Protection Act, Indiana Code 5-11-5.5 *et seq.*; The Louisiana Medical Assistance Programs Integrity Law, La. R.S. §§ 46:437.1 *et seq.*; The Massachusetts False Claims Act, Mass. Ann. Laws. Ch. 12, §§ 5A *et seq.*; The Michigan Medicaid False Claims Act, MI Public Act 337, Public Acts of 2005, MCLS §§ 400.601 *et seq.*; Minnesota False Claims Act, Minn. Stat. §

15C.01 *et seq.*; The Nevada Submission of False Claims to State or Local Government Act, Nev. Rev. Stat. §§ 357.01 *et seq.*; The New Jersey False Claims Act, N.J. State §§ 2A:32C-1 *et seq.*; The New Mexico Medicaid False Claims Act, N.M. Stat. Ann. §§ 27-14-1 *et seq.*; The North Carolina False Claims Act, 2009-554 N.C. Sess. Laws §§ 1-605 *et seq.*; The Oklahoma Medicaid False Claims Act, Stat. tit. 63 §§ 5053 *et seq.*; The Tennessee Medicaid False Claims Act, Tenn. Code Ann. §§ 71-5-171 *et seq.*; The Texas False Claims Act, Tex. Hum. Res. Code §§ 36.001 *et seq.*; The Virginia Fraud Against Taxpayers Act, Va. Code §§ 8.01-216.1 *et seq.*; The Washington Medicaid Fraud False Claims Act, RCW §§ 74.09.201 *et seq.*, to recover all damages, civil penalties and all other recoveries provided for under the Federal FCA and the State FCAs.

## I.   **SUMMARY OF THE ACTION**

2.     UHS has knowingly violated and continues to violate the Federal and State False Claims Acts through the submission of claims for reimbursement for medically unnecessary patient admissions and stays at its behavioral health facilities across the country. Because the government insurers place no limits on the length of stay of psychiatric patients who meet the appropriate criteria, as compared to private insurers which, by contract, limit length of stay in a psychiatric hospital, and because the government insurers' per diem reimbursement rates can be considerably higher than that of private insurance, UHS' business model is to take advantage of this disparity in length of stay limitations and payment terms. That is, UHS has caused government insured patients to be admitted when they do not meet the required admissions criteria, and to stay much longer in the psychiatric hospital when the patient, in fact, meets the criteria for discharge. Rather than patients' psychiatric condition dictating the psychiatric hospital's admission and length of stay decisions, UHS is primarily driven by profits to admit the

more profitable government insured patients in its behavioral health hospitals, and to keep them hospitalized for as long as possible and much longer than patients with private insurance.

3.     Through this scheme, UHS knowingly defrauded and continues to defraud the federal and state governments by admitting and keeping government insured patients for medically unnecessary extended stays, while discharging the less profitable private insurance patients.  For example, at Bellaire, a UHS hospital located in Houston, government-insured patients stayed on average **6.55 days, or 77%, longer** than private insurance patients; and **7.25 days, or 92.8%, longer** than those patients enrolled in Managed Medicare or Managed Medicaid insurance programs.  For the most frequent diagnoses given, such as Bipolar Disorder or Psychosis, the distribution of which is consistent between government and private payors, the government insured Bellaire patients stayed from **46% to 90% longer** than the privately insured patients with the same diagnoses.

4.     As a part of this fraudulent scheme, the medical record documentation used to support admissions and continued hospital stays was wholly inadequate, often fictitious, did not meet CMS requirements and did not support the medical necessity of those admissions and continued stays.  In addition, UHS billed for, but did not provide, the required active treatment for those patients it had hospitalized, and actively and illicitly recruited patients to be hospitalized who did not require or meet the medical necessity criteria for such hospitalization. To further increase its profits, UHS caused illegal billings to Medicare Part D for hospitalized patients, illegally used chemical restraint to increase patients' lengths of stay and admitted patients into Partial Hospitalization Programs (PHPs) who did not meet the medical necessity criteria for admission to those programs.

5.      In his former position as Executive Medical Director, and current position as Medical Director, Relator (1) directly witnessed the various components of this fraud first hand at Bellaire and certain other UHS psychiatric hospitals, (2) was told by administrators and doctors in certain other UHS psychiatric hospitals that this fraudulent activity occurs in those hospitals, and (3) believes, based on his experience, both direct and indirect, with UHS corporate personnel, who received and reviewed relevant admission and length of stay metrics by hospital and conducted and/or participated in daily hospital conference calls during which they micromanaged admission and continued stay decisions of Medicare/Medicaid patients, that UHS' fraudulent admission and retention of government insured patients was knowingly conducted on a nationwide basis.

## II.    **THE PARTIES**

6.      The United States is a plaintiff to this action, which it brings on behalf of the Department of Health and Human Services ("HHS"), the Centers for Medicare and Medicaid Services ("CMS"), and other federally funded healthcare programs, including Medicare, Medicaid, TRICARE, and the Veterans Administration.

7.      Medicare is a government health insurance program for people age 65 or older, certain disabled people under age 65, and people of all ages with end stage renal disease. See 42 U.S.C. §§ 426 and 426A. Medicare Part B provides outpatient medical care coverage to qualified beneficiaries. CMS, which is part of HHS, administers Medicare.

8.      TRICARE is a federally funded program providing medical benefits to military personnel, their families, retired veterans, and reservists called to duty. See 32 C.F.R. § 19 et seq.

9.      The Veterans Administration is a federally funded and administered program which provides medical benefits to military veterans and their dependents.

4

10.     Medicaid is a government health insurance program funded jointly by the Federal and State governments. See 42 U.S.C. § 1396 et seq. Each State administers its own Medicaid program. However, each State program is governed by Federal statutes, regulations and guidelines. The federal portion of each State's Medicaid payment – the Federal Medical Assistance Percentage – is based on that State's per capita income compared to the national average. During the relevant time period, the Federal Medical Assistance Percentage was between approximately 50% and 80%.

11.     Throughout the relevant time period, the services specified herein were provided to Medicaid beneficiaries in the States California, Colorado, Connecticut, Delaware, Florida, Georgia, Illinois, Indiana, Louisiana, Massachusetts, Michigan, Nevada, New Jersey, New Mexico, North Carolina, Oklahoma, Tennessee, Texas, Virginia and Washington (hereinafter referred to as the "Plaintiff States").

12.     All of the Plaintiff States are plaintiffs in this action.

13.     Throughout the relevant time period, the services described herein were provided to beneficiaries of Medicare, Medicaid, TRICARE, the Veterans Administration, and other federally and state funded healthcare programs (collectively referred to herein as "government payers" or "government insurers").

14.     Relator Dr. Ashok Jain is a citizen of the United States and resident of Texas. He earned his medical degree in India and did his residency at the University of Texas, where he was in the 99 percentile) and was selected as Chief Resident of 52 Residents.  He is triple Boarded by the American Board of Psychiatry and Neurology in General Psychiatry, Pain Medicine, and Forensic Psychiatry.  Currently, in addition to his private practice in Sugar Land, Texas, he is contracted by Behavioral Hospital of Bellaire.  There, he began as Medical Director

5

of the Intake Department and Medical Director of the Pain Program beginning June 2011.  He was appointed the Executive Medical Director on September 21, 2012 and was a member of the Board of Directors.  As a result of his complaints about the frauds set forth herein, he was demoted from Executive Medical Director to Medical Director of the Pain Center in July 2013.

15.     Defendant Universal Health Services, Inc. (UHS), a Delaware corporation, was founded in 1979 and is headquartered in King of Prussia, Pennsylvania.  Through its subsidiaries, UHS owns and operates acute care hospitals, behavioral health centers, surgical hospitals, ambulatory surgery centers, and radiation oncology centers. As of February 28, 2013, the company owned and/or operated 23 acute care hospitals and 197 behavioral health centers located in 37 states, Washington, D.C., Puerto Rico, and the U.S. Virgin Islands. It also manages and/or owns five surgical hospitals, and surgery and radiation oncology centers located in four states. Net revenues from UHS' behavioral health care facilities accounted for 50% of its consolidated net revenues during 2012, or a total of $3.46 billion.  A complete list of UHS' Behavioral Health Facilities is attached hereto as Attachment A.

16.     Defendant Ascend Health Corporation (Ascend) was acquired by UHS in October, 2012 for $503 million. At the time of the acquisition, Ascend was the largest private behavioral health care provider, with 9 owned or leased freestanding inpatient behavioral health care facilities located in 5 states, including Texas, Arizona, Utah, Oregon and Washington and an aggregate of approximately 800 licensed beds.

17.     The 9 behavioral health hospitals owned by Ascend and acquired by UHS include the following, each one of which is a Defendant in this action:

6

| Behavioral Hospital of Bellaire | Houston, Texas |
| Cedar Hills Hospital | Beaverton, Oregon |
| Mayhill Hospital | Denton, Texas |
| Salt Lake Behavioral Health | Salt Lake City, Utah |
| Schick Shadel Hospital | Burin, Washington |
| The Recovery Center | Wichita Falls, Texas |
| University Behavioral Health of Denton | Denton, Texas |
| University Behavioral Health of El Paso | El Paso, Texas |
| Valley Hospital | Denton, Texas |

18.   Defendant Psychiatric Solutions, Inc. (PSI), based in Franklin, Tennessee, was acquired by UHS in November 2010 for a total purchase price of $3.1 billion. At the time of the acquisition, PSI was the largest operator of freestanding inpatient behavioral health care facilities, and operated a total of 94 inpatient and 11 outpatient facilities in 32 states, Puerto Rico, and the U.S. Virgin Islands, with an aggregate of approximately 11,500 licensed beds.[1] UHS' acquisition of PSI made UHS the country's largest owner of freestanding inpatient psychiatric facilities.

19.   Defendant Behavioral Hospital of Bellaire (Bellaire), located at 5314 Dashwood Drive Suite 200 Houston, TX 77081-4603, is one of the nine behavioral health care facilities acquired by UHS from Ascend and is the facility that contracts with Relator. Bellaire also owns the following two outpatient facilities:

- Aldine Outpatient Center 2814 Aldine Bender Houston, TX 77032
- Tomball Outpatient Center28437 Tomball Parkway Tomball, TX 77375-3307

20.   Bellaire currently has 76 beds with plans to expand to 115, and offers the following mental health and substance abuse programs:

- Inpatient Services, including:

---

[1] In connection with its receipt of antitrust clearance for the acquisition, UHS agreed to divest a PSI facility in Delaware, two PSI facilities in Las Vegas, Nevada, and a UHS facility in Puerto Rico.

7

- o **Mental Health Program** – inpatient mental health treatment for people experiencing severe mental illness. Twenty-four-hour supervision is provided.
- o **Detox** –allows an individual to cleanse the body from alcohol or drugs while managing the symptoms of withdrawal.
- o **Chemical Dependency Program** – provides patients with a treatment protocol to break the cycle of dependency on alcohol and drugs.
- o **Rehabilitation Program** – provides an extended stay for patients who require ongoing support to maintain sobriety and strengthen their recovery skills.
- o **Crisis Stabilization Program** – stabilizes patients with acute or severe psychiatric symptoms.
- o **Co-occurring Disorders Program** – delivers specialized care for individuals who face a combination of mental illness and drug or alcohol dependency.

- Outpatient Services, including:

  - o **Intensive Outpatient Program (IOP)** – for patients who have achieved some stability, but continues to need more intensive treatment.
  - o **Partial Hospitalization Program (PHP)** – while the patient lives at home, he or she commutes to Behavioral Hospital of Bellaire each day to receive treatment.

- Specialty programs, including:

  - o **Exclusively Women -** designed to meet the mental health needs of women.
  - o **Senior Mental Health and Chemical Dependency -** provides specialized care for older adults.
  - o **Behavioral Pain Management Program -** treatment for adults with both medical and psychiatric diagnoses who suffer from chronic pain.

21.    Bellaire's current leadership is as follows:

- Drew Martin, (Interim) Chief Executive Officer
- Teresa Logsdon, Chief Financial Officer
- Jamal Rafique, MD, Medical Director
- Jennifer Vester, Director of Nursing
- Andre Bennett, Director of Business Development, Bellaire
- Deborah Drake, Director of Clinical Services
- Terri Kennedy, Director of Care Center (Admissions)

## III.    JURISDICTION AND VENUE

22.    Jurisdiction is founded upon the Federal False Claims Act (the "Act" or the "False Claims Act"), 31 U.S.C. § 3729 *et seq.*, specifically 31 U.S.C. § 3732(a) and (b), and also 28 U.S.C. §§ 1331, 1345.

23.    Venue in the Eastern District of Pennsylvania is appropriate under 31 U.S.C. § 3732(a) in that, at all times material to this civil action, Defendants transacted business in the Eastern District of Pennsylvania.

## IV.    THE FALSE CLAIMS ACTS

24.    The Federal False Claims Act ("FCA"), 31 U.S.C. §§ 3729-3733, provides, inter alia, that any person who (1) "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval," or (2) "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim," is liable to the United States for a civil monetary penalty plus treble damages. 31 U.S.C. § 3729(a)(1)(A)-(B).

25.    The terms "knowing" and "knowingly" are defined to mean "that a person, with respect to information (1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information." 31 U.S.C. § 3729(b)(1)(A)(i)-(iii). Proof of specific intent to defraud is not required. 31 U.S.C. § 3729(b)(1)(B).

26.    The term "claim" means "any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property, that (1) is presented to an officer, employee, or agent of the United States; or (2) is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Governments behalf or to advance a Government program or interest, and if the United States Government (a) provides or has provided any portion of the money or property requested or demanded; or (b) will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded . . . ." 31 U.S.C. § 3729(b)(2)(A)(i)-(ii).

9

27.     "[T]he term 'material' means having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." 31 U.S.C. § 3729(b)(4).

28.     Each of the Plaintiff States has individually enacted a False Claims Act. Each of those Acts is modeled after the Federal FCA, and each contains provisions similar to those quoted above. Relator asserts claims under the State FCAs for the State portion of Medicaid false claims detailed in this Complaint.

## V.     THE FALSE CLAIMS SCHEME

### 1.     Background on Payment to Inpatient Psychiatric Facilities

29.     Due to the frauds outlined herein, UHS' inpatient revenues from its behavioral health operations is strong and getting stronger. Inpatient admissions to UHS' behavioral health care facilities increased 4.9% during 2012, as compared to 2011, while patient days increased 1.0%. UHS' total net revenues from behavioral health care facilities increased 5% or $151 million from 2011, to a total of $3.46 billion in 2012.

30.     These revenues are based on payments for services rendered from a variety of sources: private insurers, managed care plans, the federal government including the Medicare program, state governments under their respective Medicaid programs and directly from patients. The single largest source of payments for services was Medicare and Medicaid, which represented 39% of UHS' net patient revenues during 2012. UHS' inpatient revenues depend primarily upon inpatient occupancy levels, and outpatient revenues depend on the medical and ancillary services and therapy programs ordered by physicians and provided to patients, the volume of outpatient procedures and the charges or negotiated payment rates for such services.

31.      Inpatient psychiatric hospitalization provides twenty four (24) hours of daily care in a structured, intensive, and secure setting for patients who cannot be safely and/or adequately managed at a lower level of care.

32.      Prior to 2005, psychiatric services in these hospitals and units (called Inpatient Psychiatric Facilities or IPFs) were reimbursed for "reasonable costs" of providing service to Medicare beneficiaries, subject to a limit on allowable costs. This cost system was governed by the Tax Equity and Fiscal Responsibility Act (TEFRA) of 1982.

33.      Beginning January 2005, a Federal per diem base rate was established under the Inpatient Psychiatric Facility Prospective Payment System (IPF PPS) to be paid to all IPFs based on the sum of the national average routine operating, ancillary, and capital costs for each patient day of psychiatric care.  This base rate in 2013 is $698.51 and for 2014 is $713.19. IPF PPS covers inpatient psychiatric services that are furnished in specialized hospitals, psychiatric distinct parts or exempt units located in hospitals, and beds located in acute care hospitals that are in a separately certified exempt unit.

34.      The base rate is then adjusted to account for patient and facility characteristics that are associated with significant cost differences. The patient characteristics include:

- **Age**—In general, payment increases with increasing age over 45.

- **Diagnosis**—Patients are assigned to one of 15 psychiatric diagnosis related groups (DRGs), such as psychosis, depressive neurosis, or personality disorders. Medicare assigns a weight to each of the DRGs reflecting the average costliness of cases in that group compared with that for the most frequently reported psychiatric DRG in FY 2002 (DRG 430, psychosis).

- **Comorbidities**—This adjustment recognizes the increased costs associated with 17 specific patient conditions—such as renal failure, diabetes, and cardiac conditions—that are secondary to the patient's principal diagnosis and that require treatment during the stay.

- **Length of stay**—Per diem payments decrease as patient length of stay increases.

11

Facility-based adjustments include:

- **Wage index adjustment**—The labor-related share (76 percent) of the base per diem payment is adjusted by an area wage index to reflect the expected differences in local market prices for labor.

- **Rural location adjustment**—IPFs in rural areas are paid 17 percent more than urban IPFs.

- **Teaching adjustment**—Teaching hospitals have an adjustment based on the ratio of interns and residents to average daily census.

- **Cost of living adjustment**—IPFs in Alaska and Hawaii are paid up to 25 percent more than IPFs located in other areas, reflecting their disproportionately higher costs.

- **Emergency department adjustment**—IPFs with qualifying emergency departments (which Bellaire has) are paid 31 percent more for their patients' first day of the stay.

- **ECT** - IPFs also receive an additional payment for each electroconvulsive therapy (ECT) treatment furnished to a patient. In RY 2009, the ECT payment is $275.

- **Outlier payments – additional payments for extremely costly care**—The IPF PPS has an outlier policy for cases that have extraordinarily high costs, drawn from an outlier pool of 2 percent of total payments. Medicare makes outlier payments when an IPF's estimated total costs for a case exceed a threshold ($11,600 for 2014 and $10,245 in 2013), plus the total payment amount for the case. Medicare will cover 80 percent of the costs above this amount for days 1 through 9, and 60 percent of the costs above this amount for the remaining days.

*See* Federal Register, Vol. 78, No, 148, Part III, Department of Health and Human Services,

CMS-1447-N, at 46734.

35.     Relator believes that the per diem compensation paid by Medicare to Bellaire for

inpatient psychiatric patients, including all relevant adjustments to the base rate, has averaged

approximately $1100-$1300.

36.     Medicare beneficiaries treated for psychiatric conditions in an IPF (such as each

of the 197 UHS behavioral health hospitals) are covered for 90 days of care per illness, with a

60-day lifetime reserve.  Over their lifetimes, beneficiaries are limited to 190 days of treatment

12

in freestanding psychiatric hospitals. 42 CFR § 409.62 Prior to admission, there is no requirement for pre-authorization.

37.     After a Medicare patient is admitted to an IPF, the only restrictions on that patient's continued length of stay (LOS) in that hospital is that the physician must recertify as of the 12th day of hospitalization and every 30 days thereafter that "the services were and continue to be required for treatment that can reasonably be expected to improve the patient's condition or for diagnostic study, and that the patient continues to need, on a daily basis, active treatment furnished directly by or requiring the supervision of inpatient psychiatric facility personnel." Medicare Benefit Policy Manual, Ch. 2, § 30.2.1.2 – Recertification.[2]

38.     In contrast, private insurance companies have much stricter requirements for admission, continued length of stay and per diem payments.  Bellaire and other UHS IPFs typically accept the following private medical insurance, among others: United Healthcare (UHC), Blue Cross Blue Shield (BCBS), Aetna, Cigna, Mutual of Omaha, Evercare, Managed Medicare (Amerigroup, Humana) and Managed Medicaid (Amerigroup, Molina Healthcare). These private insurance companies require preauthorization prior to admission to an IPF, and then reauthorization each day after the patient is admitted.  Thus, the patient's file is reviewed every single day in order for the patient to remain hospitalized.  These insurers allow up to a total of approximately 3-5 days per admission.  Some allow additional days beyond that only with peer review.  The per diem compensation paid by these insurers to IPFs for inpatient treatment of psychiatric patients is approximately $800, without any adjustments to that amount.  The Evercare per diem payment amount was $700, without any adjustment.

---

[2] Citations throughout this Complaint to the Medicare Benefit Policy Manual will be as "Medicare Manual, Ch. __, § __."

**2.     UHS Hospitalized Patients Did Not Meet the Medical Necessity Criteria for Admission.**

**a.     The Relevant Standards**

39.     To be admitted into an IPF, the patient must require intensive, comprehensive, multimodal treatment including 24 hours per day of medical supervision and coordination because of a mental disorder. The need for 24 hours of supervision may be due to the need for patient safety, psychiatric diagnostic evaluation, potential severe side effects of psychotropic medication associated with medical or psychiatric comorbidities, or evaluation of behaviors consistent with an acute psychiatric disorder for which a medical cause has not been ruled out.

40.     The acute psychiatric condition being evaluated or treated by an inpatient psychiatric hospitalization must require active treatment, including a combination of services such as intensive nursing and medical intervention, psychotherapy, occupational and activity therapy. Patients must require inpatient psychiatric hospitalization services at levels of intensity and frequency exceeding what may be rendered in an outpatient setting, including psychiatric partial hospitalization. There must be evidence of failure at, inability to benefit from, or unacceptable risk in an outpatient treatment setting.

41.     For all IPFs, a provisional or admitting diagnosis must be made on every patient at the time of admission, and must include the diagnosis of comorbid diseases as well as the psychiatric diagnosis. *See* Medicare Manual; Ch.2, § 20-Admission Requirements.

42.     Through Local Coverage Determinations (LCDs), Medicare uses the following parameters to describe the severity of illness and intensity of service that characterize a patient appropriate for inpatient psychiatric hospitalization:

1. Threat to self requiring 24-hour professional observation:
    a) suicidal ideation or gesture within 72 hours prior to admission
    b) self-mutilation (actual or threatened) within 72 hours prior to admission

14

c) chronic and continuing self-destructive behavior (e.g., bulimic behaviors, substance abuse) that poses a significant and/or immediate threat to life, limb, or bodily function.

2. Threat to others requiring 24-hour professional observation:

a) assaultive behavior threatening others within 72 hours prior to admission.
b) significant verbal threat to the safety of others within 72 hours prior to admission.

3. Command hallucinations directing harm to self or others where there is the risk of the patient taking action on them.

4. Acute disordered/bizarre behavior or psychomotor agitation or retardation that interferes with the activities of daily living (ADLs) so that the patient cannot function at a less intensive level of care during evaluation and treatment.

5. Cognitive impairment (disorientation or memory loss) due to an acute Axis I disorder that endangers the welfare of the patient or others.

6. For patients with a dementing, disorder for evaluation or treatment of a psychiatric comorbidity (e.g., risk of suicide, violence, severe depression) warranting inpatient admission.

7. A mental disorder causing major disability in social, interpersonal, occupational, and/or educational functioning that is leading to dangerous or life-threatening functioning, and that can only be addressed in an acute inpatient setting.

8. A mental disorder that causes an inability to maintain adequate nutrition or self-care, and family/community support cannot provide reliable, essential care, so that the patient cannot function at a less intensive level of care during evaluation and treatment.

9. Failure of outpatient psychiatric treatment so that the beneficiary requires 24-hour professional observation and care. Reasons for the failure of outpatient treatment could include:

a) Increasing severity of psychiatric symptoms;
b) Noncompliance with medication regimen due to the severity of psychiatric symptoms;
c) Inadequate clinical response to psychotropic medications;
d) Due to the severity of psychiatric symptoms, the patient is unable to participate in an outpatient psychiatric treatment program.

*See, e.g.,* Psychiatric Inpatient Hospitalization (L30441); LCD - Local Coverage Determination;

Medicare Policies and Guidelines; Original Determination Effective Date: 2010-03-18; Latest

Revision Effective Date: 2012-10-22.

43.    Currently Medicaid does not reimburse free standing psychiatric institutions, referred to in Medicaid as "institutions for mental disease" (IMDs), for services provided to Medicaid enrollees aged 21 to 64. This restriction is known as Medicaid's IMD exclusion.  Due to the IMD exclusion, Medicaid enrollees aged 21 to 64 with acute psychiatric needs, such as those expressing suicidal or homicidal thoughts, are diverted to general hospital emergency departments, which often lack the resources or expertise to care for these patients.  A program called the Medicaid Emergency Psychiatric Demonstration was established in 2011 under Section 2707 of the Patient Protection and Affordable Care Act to provide up to $75 million in federal Medicaid matching funds over three years to enable private psychiatric hospitals (IMDs) to receive Medicaid reimbursement for treatment of psychiatric emergencies, described as suicidal or homicidal thoughts or gestures, of Medicaid enrollees aged 21 to 64 who have an acute need for treatment.

44.    Admission to an IPF can be voluntary, or involuntary.  Involuntary admissions may take one of the following procedures:

> a. A lay person seeks an Emergency Detention Order from a Judge to commit someone:  A Court Order, if granted, then goes to a Sherriff, who picks up the patient and takes him or her to the Emergency Room of a hospital or to a psychiatric hospital for admission.  A psychiatrist must see and evaluate the patient within first 24 hours and then send a report to the Court.

> b. A Sherriff can pick someone up directly.  He must then submit an Emergency Detention Form to the Emergency Room of a hospital or to a psychiatric hospital for admission for the person to be admitted.  A psychiatrist must see and evaluate the patient within first 24 hours and then send a report to the Court.

> c. For a patient in the Emergency Room of a hospital or to a Psychiatric Emergency Room at a hospital, the attending doctor files a patient form with Court to transfer the patient to a psychiatric hospital.  There, a psychiatrist must see and evaluate the patient within the first 24 hours and then send a report to the court.

45.     The Admissions Process for voluntary patients at a UHS psychiatric hospital such as Bellaire includes the following required steps for Medicare patients:

a.  Typically a patient or someone on the patient's behalf such as a family member telephones the hospital.

b.  Once the patient is at the hospital, a licensed clinical social worker conducts an interview of the patient, called the Clinical Assessment, in which he or she interviews the patient, takes notes, and then classifies the patient on each of the 5 distinct axes as set forth in DSM-IV (Diagnostic and Statistical Manual of Mental Disorders, 4th edition, 1994).

c.  The multi-axial system of DSM-IV is the way in which DSM-IV tries to address "the whole person." It grows out of the professional conviction that, in order to intervene successfully in an emotional or psychiatric disorder, one needs to consider the affected person from a variety of perspectives.

In DSM-IV clinical disorders are listed on 3 separate axes, plus two additional descriptive axes, as described below:

**Axis I** refers broadly to the principal disorder that needs immediate attention; e.g., a major depressive episode, an exacerbation of schizophrenia, or a flare-up of panic disorder.

**Axis II** lists any personality disorder that may be shaping the current response to the Axis I problem. Axis II also indicates any developmental disorders, such as mental retardation or a learning disability, which may be predisposing the person to the Axis I problem. For example, someone with severe mental retardation or a paranoid personality disorder may be more likely to be derailed by a major life stressor, and succumb to a major depressive episode.

**Axis III** lists any medical or neurological problems that may be relevant to the individual's current or past psychiatric problems; for example, someone with severe asthma may experience respiratory symptoms that are easily confused with a panic attack, or indeed, which may precipitate a panic attack.

**Axis IV** codes the major psychosocial stressors the individual has faced recently; *e.g.*, recent divorce, death of spouse, job loss, etc.

**Axis V** codes the "level of function" the individual has attained at the time of assessment, and, in some cases, is used to indicate the highest level of

function in the past year. This is coded on a 0-100 scale, with 100 being nearly "perfect" functioning.[3]

d. After the interview is complete and the DSM-IV axes identified, the intake social worker then recommends one of the following four levels of care for the patient, known as the Care Recommendation:
    i. Inpatient hospitalization
    ii. Partial Hospitalization Program (PHP)
    iii. Intensive Outpatient Program (IOP)
    iv. Outpatient treatment

e. A doctor then conducts a review and makes an admission decision. Bellaire and other UHS hospitals engage a separate company that has nonpsychiatric medical doctors on staff in a different city to conduct these reviews by interviewing the patient through long distance videoconferencing, known as telemedicine. Bellaire has, in the past, contracted with a company called Premier Medical Group and now uses DrSays LLC, a company headed by Jesse Chang, M.D.

f. A complete medical history and physical examination of an admitted patient must be completed in all cases within 24 hours after admission of the patient. The October 24-25, 2013 JCOAHO Survey of Bellaire (at p. 16, citing Rule and Regulations Section 2.8) found Bellaire had insufficient compliance with this requirement, noting one instance where a patient had been admitted four days earlier but the patient medical record contained a history and physical examination done by an outside institution in another city with no note by a physician privileged at Bellaire confirming or updating this history and examination.

g. A full psychiatric evaluation is then required within 60 hours of admission. Medicare Manual, Ch. 2, § 30.2(1). The psychiatrist could, after that evaluation, discharge the patient. For Medicare patients, 99% of the time the psychiatrist did not discharge the patient, but elected to keep the patient hospitalized.

h. Certification is required at the time of admission or as soon as practicable thereafter that "the services furnished can reasonably be expected to improve the patient's' condition or for diagnostic study." *Id.* § 30.2.1.1.

### b.    <u>The Standards and Criteria for Admission Were Consistently Violated.</u>

46.    These procedures, requirements and criteria were consistently violated in admitting patients to Bellaire. Relator estimates that at least 50% of Bellaire's admissions of

---

[3] http://faculty.fortlewis.edu/burke_b/Abnormal/Abnormalmultiaxial.htm

government insured patients through this process were improper and did not follow the requisite standards.

47.     UHS hospitals have a stated goal to convert 90% of calls to a hospital's front desk from or regarding a potential patient into hospital visits. This means for all calls to the hospitals expressing concerns about an individual, UHS desires that 90% of those individuals will soon after that call visit the hospital in person.

48.     Due to internal Company pressure as set forth below, the intake social worker nearly always recommends inpatient hospitalization and manufactures the appropriate paperwork containing false diagnoses and fraudulent documentation to support that recommendation. Confinement in a 24-hour locked down psychiatric facility is, for many of the patients admitted as inpatients, unnecessary, unwarranted and not the least restrictive form of efficacious treatment available.

49.     Despite the fact that UHS hospitals use general physicians in the admissions process through telemedicine, nonpsychiatric medical doctors cannot admit a patient. Only a psychiatrist can do so.  On October 24-25, 2013, the Joint Commission on Accreditation of Healthcare Organizations (JCOAHO) conducted a survey of Bellaire and reprimanded Bellaire for use of nonpsychiatric medical doctors to conduct psychiatric evaluations and admit patients. (p. 20).  Since that reprimand, Bellaire has ceased allowing nonpsychiatric medical doctors to admit patients.

50.     Even if such admissions by nonpsychiatric medical doctors through telemedicine were allowed, roughly half of the time Bellaire's video conferencing capability was non-functioning, and the Premier Medical Group doctor was forced to simply speak on the telephone to the social worker who conducted the Clinical Assessment and base his decision from only her

19

perceptions and impressions, as relayed to him.  In a conversation with Relator on or around June, 2013, Kevin Quicho, former Intake Director at Bellaire, stated that most of the time the computer for the telemedicine intake process "had a lag time or it wouldn't connect at all" and that because the telemedicine computer was not working approximately 45% of the time, they just used a telephone instead and not the required videoconferencing.

51.    Such telemedicine doctors did not use the correct admissions criteria when deciding whether to admit patients.  Rather than applying the required criteria is set forth in ¶42 above, such doctors considered only whether the patient was medically stable or not.  Relator attended a conference call in March 2013 with the Premier CEO (Tony Rex) and a cardiac surgeon who was a Premier Telemedicine employee.  On this call, the CEO admitted that the psychiatric hospital admissions standard used by Premier Telemedicine doctors was simply whether the patient was medically stable or not.  Doctors at the current telemedicine group, DrSays LLC, simply copy the information typed in by the Bellaire intake staff and then admit the patient, essentially ceding medical intake decisions to a social worker on the intake staff.

52.    Premier maintained an extraordinarily high 75% conversion ratio for Bellaire. This means that in 75% of the patient reviews Premier conducted of individuals for admission to Bellaire, the decision was made to admit that individual as an inpatient.

53.    Only companies like Premier who used a relaxed standard of admission and achieved high conversion rates were given such telemedicine admissions contracts with UHS hospitals.  Furthermore, the same company given the contract to screen and admit patients was also given a contract to provide inpatient medical services at the hospital, such as controlling patients' diabetes or treating their heart ailments.   This incentivized Premier and other

telemedicine companies engaged by UHS to admit as many patients as possible, because its revenues would increase the more patients it could treat in the psychiatric hospital.

54.     At Bellaire, Relator believes that it has never been the case that a social worker conducting a Clinical Assessment who recommended admission of a Medicare patient was overruled by the telemedicine screening doctor.

55.     Bellaire's new Director of Intake, Terri Kennedy, admitted to Relator in a direct conversation in mid-October 2013 that she had uncovered a problem with voluntary patients being admitted to Bellaire without having signed the required consent form.  Generally, when a patient refuses to consent to be admitted into the psychiatric hospital, the hospital must then follow the necessary steps to obtain an involuntary commitment.  This was sometimes not done at Bellaire.  The new Intake Director noted that she had reviewed the paperwork for three patients who were admitted during one week without the necessary, signed consent for admission and the Intake Department had not tried to obtain involuntary commitments.  Further, she noticed problems with the Intake Department having patients sign "blank releases" of information with no specification as to whom they were releasing the information.

56.     When a hospital is transferring a patient to a UHS psychiatric hospital as a voluntary admission, the transferring doctor must communicate directly with the admitting UHS psychiatric hospital doctor.   This doctor-to-doctor communication almost never occurred. Patient Nos. 2, 3, 4 and 5 are examples where this doctor-to-doctor communication did not occur.

57.     Patients with private insurance are subject to a different admissions process. Private insurance companies require that their insureds receive a preauthorization before a mental health care provider can be reimbursed for any care provided or services rendered in an

inpatient psychiatric facility.  Relator believes that approximately 60-70% of the time a private patient requested preauthorization to be admitted to Bellaire, such preauthorization was denied.

58.    There is an express and implied policy at Bellaire, at all of the nine Ascend hospitals acquired by UHS, and, to Relator's knowledge and belief, at all of the 197 UHS psychiatric hospitals across the country, to admit and keep as many Medicare, Medicaid and Tricare patients as possible for as long as possible.

59.    The UHS Admissions Departments, known at Bellaire as the Care Center, falsifies admission records to conform to the required Medicare, Medicaid and Tricare admissions criteria such that a maximum number of government-insured patients are admitted. As such, the determination is made to admit a patient solely on the basis of insurance and not the true condition and needs of the patient.  Any refusal to admit a Medicare patient, no matter what the presenting illness or best treatment, is frowned upon by the administration.  As a result, Medicare patients are rarely rejected from admission to Bellaire or other UHS hospitals.

        c.      **UHS Closely Monitored Admissions and LOS Metrics to Further Its Scheme and Maximize Profits.**

60.    UHS' policy of directing intake personnel to admit as many government-insured patients as possible was made explicit at Bellaire during daily Flash Meetings.  These were daily telephonic conferences beginning at 10:30 am and lasting approximately one hour.  All the senior Bellaire staff attended in person, including the CEO, CFO, Director of Counseling, Director of Nursing, Utilization Review Director, Billing Director and Director of Admissions. Corporate staff from UHS headquarters (usually Martin Schappell or his designee) attended by telephone or in person.  The regional corporate business office located in Denton, Texas, which office oversees the operations of at least four UHS hospitals, also participated and still participates by telephone in Bellaire's daily Flash Meetings.  No doctors were usually present.

Relator was present 2-3 times in his capacity as Bellaire Executive Medical Director over last 2 years.

61.     The goals of these Flash Meetings was and is to monitor the admissions, discharges and lengths of stay (LOS) of government-insured patients, particularly those with Medicare because of Medicare's generous per diem rates, generous allowances for lengths of stay and minimal restrictions on a patient's care and continued hospital stays.  The overarching goal was to enact, promote and maintain policies that would maximize UHS revenues from government insurance sources.

62.     In a conversation with Relator on October 9, 2013, Bellaire Director of Utilization Management Kerri Francis, who attended many if not all of the Flash Meetings, stated that under former Bellaire CEO John Nekic, the daily Flash Meetings included extensive discussions regarding, *inter alia,* every patient admission, every patient discharge, insurance authorizations, and peer reviews.  They would also discuss the "over/under," which is the difference between the number of days authorized by insurance for a patient's length of stay versus the patient's actual length of stay.  In addition, under current CEO Martin, she has to report to Martin about any Medicare patients staying in the hospital less than 7 days and justify why the patient was staying less than 7 days.

63.     The following daily reports were generated at the end of each day for each UHS psychiatric hospital (by Intake Director Debra Drake at Bellaire), circulated to UHS Senior Vice President Martin Schappell at UHS corporate offices, and then discussed the next day at the Flash Meeting.

- **Daily Flash Reports**, which report the total number of patients in the hospital and list patient names by hospital unit and show for each patient, *inter alia*, the primary insurance payor, LOS and admitting diagnosis.

23

- **Census Reports**, which are comprised of five separate charts including, inter alia:
  - an <u>Inpatient Census</u> that lists the number of inpatients for each day of the month by psychiatric unit (e.g. youth, adult, women, etc.), and shows the Average LOS for the month, the budgeted average monthly LOS and the variance between the two.
  - a <u>Mix Trend</u>, updated weekly, that shows the total number and percentage of patients by insurance payor type, including by Medicare, Medicaid and TriCare.

  - They also include <u>Instructions</u> from UHS corporate to the individual hospital explaining how to fill out the Census Report form and stating, "Distribution each business day by noon eastern time" to VP, Regional CFO, and three other UHS employees.

64.     Martin Schapell is Senior Vice President of UHS and the UHS regional director of the Central Region responsible for 20-25 hospitals. He attended in person or by telephone the daily Bellaire Flash Meetings that Relator attended in person. Upon information and belief, he attended by telephone the Flash Meetings for the other UHS hospitals in his region. Upon information and belief, the regional directors for the other UHS regions attended Flash Meetings for the UHS hospitals in their specific regions and similarly focused on ways to maximize UHS profits through admissions, discharges and LOS of government-insured patients.

65.     In a conversation with Relator on or around August 27, 2013, Tony Borgadus, a former UHS employee at West Oaks Hospital, confirmed that management of West Oaks Hospital in Houston held daily Flash Meetings to discuss, *inter alia*, patient admissions and discharges, and that West Oaks reported to UHS corporate on a monthly basis. Upon information and belief, daily Flash Meetings took place at UHS hospitals nationwide.

66.     With regard to admissions, it was stated that UHS's goal was to admit 90% of all government-insured patients who presented for admission (called the "conversion ratio"). UHS hospitals generated a monthly report, called an ARMS Report, to keep track of its admissions metrics. This report tracked for each day of each month, *inter alia*, the percentage of phone calls

to the hospital that led to patient assessments, the percentage of patient assessments that led to hospital admissions (the conversion ratio) and the percentage of phone calls to the hospital that led to hospital admissions. It also tracked the total discharges each day. For example, the Bellaire ARMS Report for March 2013 shows that on 17 days of that month, 100% of all patients assessed were admitted. The average for the month was 93.2% of assessments resulting in hospital admissions. The hospital Intake Director and CEO received and reviewed the ARMS report each month.

67.     Each day, the Intake Department analyzed all, if any, government insurance patients who were refused admission on the prior day to better understand how they could increase their Medicare and other government insurance patient conversion ratio.

68.     During the admissions process, if it is determined that the patient has no insurance or only a minimum number of allowable psychiatric hospitalization days available on the patient's Medicare insurance, all efforts are made to document that the patient does not meet the Medicare criteria of admission and to discharge the patient directly and immediately from the intake department. The Intake Department maintained a list of patients to be turned away from admissions immediately, called a Target List, because they had no insurance at all, because their private insurance would not cover their hospitalization, or because "Pt has exhausted his Medicare PSYCH days, " which was a frequent entry on those Target Lists.

69.     In a conversation with Relator on or around July 23, 2013, Alex Vela, former Care Center/Intake Director of Bellaire, explained the "games" they play in admitting patients to the hospital. According to Vela, the admission decision is based on whether the potential patient has insurance and not on whether they meet the admissions criteria. She explained that if a patient does not have insurance and does not meet the admissions criteria, Bellaire refers the

patient out to an outpatient or some other facility.  However, if the patient does have insurance coverage but does not meet the admissions criteria, she explained, they "push" to admit the patient.  She stated, "[I]f you're going to be taking everybody that walks through the door, you're not going to be making money."  She further stated, "[Y]ou know, that's the game." Further, for Medicare patients, in making the initial assessment, she admitted that they "push the symptoms" meaning they exaggerate the patient's symptoms in order to justify admissions. She said "Even if it's not suicidality, you still push it."  Also, significantly, as the former Care Center/Intake Director, she incorrectly stated the Medicare admissions standard – if admission to the hospital would benefit the patient.  Other UHS employees also expressed this erroneous admissions standard at various times, including Martin Schappell, John Nekic, Drew Martin, Gary Massey, Deborah Drake, Kerri Francis, Heidi Evans, Jennifer Vester and  Jamal Rafique.

### d.      Examples of Patients Who Were Fraudulently Admitted.

70.      The following are examples of patients who were admitted to Bellaire in violation of Medicare rules and regulations and as part of the fraudulent admissions scheme outlined above, and whose subsequent inpatient care at Bellaire was billed to and paid by Medicare in violation of the State and Federal False Claims Acts:

 a. Patient No. 1 was a 41 year old male who was admitted to Bellaire on August 24 2012 and discharged after 24 days on September 16th.  He was admitted apparently because of placement issues as he said that he didn't feel safe at his housing facility.  On page 87 of his chart, a comprehensive summary of his symptoms states that he has social anxiety without any mention of any active, ongoing psychosis, or that he is a danger to himself or others.  Surprisingly, the diagnosis is schizophrenia, which is not consistent with his listed symptoms. Page 90 of his chart shows that the initial treatment plan targeted a diagnosis of both Bipolar Disorder as well as Schizophrenia Paranoid time (secondary), while in DSM IV these diagnoses are exclusive to each other.  On page 91, it states that the primary problem of this patient is Social Anxiety and Mild Depression.

 b. Patient No. 2 was a 32 year old female with a history of dependence on pain pills. Her chart repeatedly states that she denied any Suicidal or Homicidal

26

thoughts/behavior.   Her admitting diagnosis of Bipolar Disorder NOS is not congruent with her reported problems and was listed to make her look much more serious than she reported to be.

c.  Patient No. 3 was a 63 year old male who had been a lifelong alcoholic who was essentially forced by his wife and daughter to go to Bellaire for rehab.   His psychiatric evaluation did not report any depression or prior psychiatric history. His admitting diagnosis was Alcohol Dependence, Marijuana Dependence and Mood Disorder NOS. He also had Hypertension and 4 bypass surgeries.   There was not any evidence of need for level I care as an inpatient in a psychiatric hospital.   Although page 293 of his chart newly states that his primary problem is being Bipolar, he was never prescribed any psychiatric medicines or mood stabilizers.

d.  Patient No. 4 was a 47 year old male with a cocaine addiction who had failed previous rehabs.   On page 61 of his chart, the telemedicine doctors claimed cocaine and depression in one line without any justification.   The psychiatric evaluation was grossly inadequate.   He did not want to take any antidepressants at the time of admission and none were started.   On page 23 of his chart, an entry falsely states his depressive symptoms in a grossly deficient QMHP assessment. This patient had a cocaine addiction and no need for psychiatric services.   The extent of his cocaine use or any resulting complications was never documented. Further, there are no withdrawal symptoms from cocaine and there was no immediate need to get off of cocaine.

e.  Patient No. 16, a 31 year old male, was admitted to Bellaire from the Love and Joy Personal Care Home in Houston with a primary admitting diagnosis of ADHD and secondarily major depression, but in truth was admitted for having an altercation with his housemate in his group home ("he started messing with me"). There is no indication of any significant decompensation.

71.    Relator has witnessed the fraud related to the admissions of government insured patients first hand at Bellaire and certain other UHS hospitals (including West Oaks Hospital), has been told by administrators and doctors in certain UHS psychiatric hospitals that this fraudulent activity occurs in those hospitals (including Cypress Creek Hospital, Kingwood Pines, West Oaks Hospital and Bellaire), and believes that this activity is a corporate wide practice that occurs in all UHS psychiatric hospitals.

### e.   UHS Engaged in Unit Allocation to Further the Admissions Scheme.

72.   Another element of the fraudulent UHS admissions scheme is known as "unit allocation" wherein a patient with private insurance or an unfunded patient who requires a bed in a particular hospital department (such as Women's or Pain Management) where no such beds are then currently available is not admitted, but a Medicare patient who requires a bed in a particular hospital department where no such beds are then currently available is admitted and rerouted to a different department where a bed is available.

73.   In addition, different units have different average lengths of stay. The Intensive Psychiatry (IP) Unit and the Adult Unit have a longer average LOS than the Women's Unit. Medicare patients were steered towards those units with a longer LOS when a different unit was more appropriate.  A Medicare patient in a unit with a longer average LOS will agree to stay longer in the hospital and not request a discharge when he sees patients around him on the same Unit staying longer as well.  The result is more billed Medicare patient days and increased profits for UHS.

74.   The following current or former UHS personnel have relevant knowledge regarding the scheme to defraud Medicare and other government programs by fraudulently admitting patients to Bellaire and other UHS hospitals who did not meet the criteria for admissions and by mandating, fostering and perpetuating a corporate policy to admit (and keep) all Medicare patients:

- Debra K. Osteen – UHS President of Behavioral Health; supervisor of Martin Schappell
- Martin C. Schappell – Senior Vice President of UHS
- Letty Lozano – UHS Corporate Director of Clinical Services
- Roy Hollis – UHS Corporate Clinical Leader
- Karen E. Johnson – UHS Senior Vice President, Clinical Services
- Tasha Hoffman – UHS Corporate Intake Director
- Terry Griffin Driver –Director of Clinical Audits

28

- Jennifer Vester – Director of Nursing, Bellaire
- Alex Vela – Bellaire Intake Department
- Isabella Stambolis – Bellaire Intake Department
- Kevin Quicho – former Director of Bellaire Intake Department
- Deborah Drake – Director of Bellaire Intake Department (Care Center)
- John Nekic – former Bellaire CEO
- Kerri Francis –Director of Utilization Management, Bellaire
- Cherrie Ramlal – UR staff, Bellaire
- Amy Bodak – UR staff, Bellaire
- Shelly Forbes – Care Center Staff, Bellaire
- Andre Bennett –Director of Business Development, Bellaire
- Gary Massey – Clinical Director of Bellaire Hospital
- Drew Martin – Current (interim) CEO, Bellaire
- Gurdip Buttar – former Medical Director of Bellaire
- Larry Flowers – Medical Director of PHPs at Bellaire
- Jamal Rafique – Current Medical Director of Bellaire

### 3.   UHS Kept Patients Hospitalized Who Met the Criteria for Discharge in order to Increase Patient Lengths of Stay and UHS Revenues.

#### a.   The Relevant Standards

75.      Medicare pays higher per diem rates for inpatient psychiatric hospitalization as compared to the per diem rates paid by a private insurance company for the same inpatient psychiatric hospitalization and corresponding treatment. Medicare also places minimal restrictions on a patient's length of stay in an IPF as compared to the rigorous daily admissions analysis and the strict limits on the number of psychiatric hospitalization days of the private insurance companies.  As a result of these two critical factors, UHS hospitals are financially incentivized to, and do maintain an overt institutionalized policy to, maximize the length of stay (LOS) of each Medicare patient admitted in order to maximize its revenues.

76.      Medicare requires discharge from inpatient psychiatric hospitalization in the following circumstances:

Discharge:
Patients that meet the discharge criteria for intensity and severity of illness would become outpatients, receiving either psychiatric partial hospitalization or individual outpatient

mental health services, rendered and billed by appropriate providers. In certain cases, it may be appropriate for a patient to receive an unsupervised pass to leave the hospital for a brief period in order to assess their readiness for outpatient care.

Discharge Criteria (Intensity of Service):
Patients in inpatient psychiatric care may be discharged by stepping down to a less intensive level of outpatient care. Stepping down to a less intensive level of service than inpatient hospitalization could be considered when patients no longer require 24-hour observation for safety, diagnostic evaluation, or treatment as described above.

Discharge Criteria (Severity of Illness):
**Patients whose clinical condition improves or stabilizes, who no longer pose an impending threat to self or others, and who do not still require 24-hour observation available in an inpatient psychiatric unit would be appropriate for a lower level of care in an outpatient setting**. Patients whom are persistently unwilling or unable to participate in active treatment of their psychiatric condition would also be appropriate for discharge (see regulations for active treatment participation).

*See, e.g.*, Psychiatric Inpatient Hospitalization (L30441); LCD - Local Coverage Determination; Medicare Policies and Guidelines; Original Determination Effective Date: 2010-03-18; Latest Revision Effective Date: 2012-10-22 (bold emphasis added).

77.      Patients who "who no longer pose an impending threat to self or others, and who do not still require 24-hour observation" but who are still ill should be transferred to one of the following lower levels of care:

- Partial Hospitalization Program (PHP) in an open psychiatric hospital;
- Assertive Community Treatment, where a team goes into the home;
- Intensive Outpatient Program in clinics; or
- Standard Outpatient Treatment.

78.      Medicare lists specific instances when coverage for inpatient psychiatric hospital services will be denied as not reasonable and medically necessary:

It is not reasonable and medically necessary to provide inpatient psychiatric hospital services to the following types of patients, and coverage is excluded under Title XVIII of the Social Security Act, Section 1862(a)(1)(A):

a) Patients who require primarily social, custodial, recreational, or respite care;

30

b) Patients whose clinical acuity requires less than twenty-four (24) hours of supervised care per day;

c) Patients who have met the criteria for discharge from inpatient hospitalization;

d) Patients whose symptoms are the result of a medical condition that requires a medical/surgical setting for appropriate treatment;

e) Patients whose primary problem is a physical health problem without a concurrent major psychiatric episode;

f) Patients with alcohol or substance abuse problems who do not have a combined need for "active treatment" and psychiatric care that can only be provided in the inpatient hospital setting. (CMS Publication 100-03, Chapter 1, Section 130.1 and 130.6, respectively);

g) Patients for whom admission to a psychiatric hospital is being used as an alternative to incarceration.

*Id.*

### b. The Standards and Criteria for Discharge Were Consistently Violated To Maximize the LOS of Government Payor Patients.

79.     UHS regularly did not and does not adhere to these discharge criteria and regularly has submitted and submits to Medicare and other government health insurance programs claims for, and has been paid by the government, per diem payments for inpatient hospitalization days that do not meet the applicable criteria for continued inpatient hospitalization and treatment.

80.     When analyzing the 3,693 patients hospitalized at Bellaire from November 2011 through July 2013 (who were hospitalized for a total of 38,202 inpatient days), and each of their insurance providers, this data reveals, as summarized in the chart below, that **government-insured patients stayed on average 6.55 days, or 77%, longer than private insurance patients; and 7.25 days, or 92.8%, longer than those patients enrolled in Managed Medicare or Managed Medicaid insurance programs.**

| Insurance Provider | Total # of Patients | Total Patient Days | Average LOS |
|---|---|---|---|
| Government (MC, MA TriCare) | 2007 | 30228 | 15.06 |
| Managed MC/MA | 1521 | 11892 | 7.81 |
| Private | 1674 | 14250 | 8.51 |
| Self Pay | 250 | 1329 | 5.316 |
| Research | 109 | 1826 | 16.75 |

81.     Government and private payor patients had roughly the same diagnoses and in similar proportional proportions.  A chart showing the distribution of diagnoses of 3,321 patients hospitalized at Bellaire from August 2010 to September August 2013, set forth below, shows that the distribution of diagnoses was consistent between government and private payors such that the diagnosis codes would not have skewed the calculation of average LOS for either category. Government and private payor patients had roughly the same diagnoses and in similar proportional proportions.



Thus, the comparison of average LOS as between government and private payors is unaffected by the diagnoses given to patients in each of those two insurance populations.

82.     A government insured patient with the exact same diagnosis code as a privately insured patient stayed significantly longer at Bellaire than the privately insured patient.  In the population of 3,321 patients hospitalized at Bellaire from August 2010 to September August 2013, the table below shows that for all the diagnoses comprising at least 5% of the stays for either government or private patients, the average length of stay for government insured patients

exceeds that of privately insured patients.   The eight ICD9s[4], tabulated below, cover approximately 70% of the stays.

### Bellaire ICD9 Diagnosis Code Frequencies and Average Lengths of Stay for Government and Private Payors (Top ICD9s)

| ICD9 | Description | Frequency | | Average LOS | |
|------|-------------|-----------|---------|-------------|---------|
| | | Government | Private | Government | Private |
| 296.2 | Depress psychosis-unspec | 3.35% | 8.53% | 11.51 | 6.69 |
| 296.3 | Recurr depr psychos-unsp | 4.89% | 6.60% | 12.52 | 6.94 |
| 296.33 | Recur depr psych-severe | 6.88% | 10.68% | 12.59 | 7.86 |
| 296.34 | Rec depr psych-psychotic | 8.33% | 5.27% | 15.43 | 8.38 |
| 296.64 | Bipol I cur mixed w psy | 9.33% | 6.23% | 15.40 | 10.15 |
| 296.8 | Bipolar disorder NOS | 11.59% | 10.61% | 11.23 | 7.69 |
| 296.9 | Episodic mood disord NOS | 14.04% | 14.47% | 13.15 | 6.89 |
| 298.9 | Psychosis NOS | 12.14% | 9.57% | 15.01 | 10.11 |
| Overall | | 70.56% | 71.96% | 13.55 | 7.95 |

83.    Based on the data in the table above, the table below shows that for the most frequent diagnoses, the government insured Bellaire patients stayed from 46% to 90% longer than the privately insured patients with the same diagnosis.

| ICD9 | Description | % increased LOS of Gov't over Private |
|------|-------------|----------------------------------------|
| 296.2 | Depress psychosis-unspec | 72.00% |
| 296.3 | Recurr depr psychos-unsp | 80.40% |
| 296.33 | Recur depr psych-severe | 60.18% |
| 296.34 | Rec depr psych-psychotic | 84.13% |
| 296.64 | Bipol I cur mixed w psy | 51.72% |
| 296.8 | Bipolar disorder NOS | 46.03% |
| 296.9 | Episodic mood disord NOS | 90.86% |
| 298.9 | Psychosis NOS | 48.47% |

84.    Data from other UHS hospitals reveal similar findings. A February 4, 2013 report from Cedar Hills Hospital containing patient data from the months of January 2013 (when 195

---

[4] ICD-9 Code, also known as ICD-9-CM, is the International Classification of Diseases classification system used to assign codes to patient diagnosis.

patients were discharged) and January 2012 (when 188 patients were discharged) shows that Medicare and Tricare patients stayed on average much longer than private insurance patients and managed care patients.

| Insurance Provider | Jan. 2013 Discharges | Jan. 2013 Avg. LOS | Jan. 2012 Discharges | Jan. 2012 Avg. LOS |
|---|---|---|---|---|
| Medicare | 68 | 15.1 | 60 | 14.8 |
| Tricare | 26 | 25.1 | 21 | 32.8 |
| Blue Cross | 25 | 6.8 | 33 | 9.4 |
| HMO/PPO | 49 | 7.5 | 63 | 9.0 |
| Managed Medicare | 16 | 9.6 | 8 | 14.3 |
| OK Medicaid | 1 | 7.0 | 0 | n/a |
| Self Pay | 10 | 5.2 | 3 | 5.7 |

85.     According to Kevin Quicho, recently in marketing at Bayshore Hospital in Houston (a UHS hospital with 44 beds) and former Intake Director at Bellaire, the average LOS for Medicare patients at Bayshore is 14-20 days.  From this and other conversations with physicians and administrators at other hospitals, including West Oaks Hospital, Kingwood Pines Hospital and Cypress Creek Hospital in Houston, Relator believes that this pattern was repeated throughout the UHS hospital system.

86.     The admissions fraud set forth above, which includes the lenient application of Medicare admissions criteria by UHS to Medicare patients as compared to the strict admissions scrutiny by private insurers who preauthorized treatment for its insureds, resulted in a private insurance patient population in the hospital that was, in actuality, sicker than the Medicare population.  Nevertheless, the LOS for the Medicare population was significantly greater.  Even if the two populations of patients could be considered equally as sick and in need of treatment, the LOS for the Medicare population was still significantly greater.

87.     Without UHS' fraudulent scheme, it would be expected that the LOS for private and government insurance patients would be roughly the same, as has been shown to exist

35

outside of UHS in other hospitalized mental health patient populations.  In an April 2009 study

by the Washington State Institute for Public Policy[5], the cost of service (and thus the LOS) for

the 115,363 adults with a mental health or substance abuse (MHSA) diagnosis in 2007 that were

hospitalized in Washington State community hospitals was roughly the same for each insurance

type – Medicare, Medicaid, HMO, private (commercial), and others (*see* 6th column below):

*Exhibit 6*
**Adult Hospital Stays by Diagnosis and Primary Payer, 2007**

| Primary Payer | No MHSA Diagnosis | | | MHSA Diagnosis | | | Overall Charges |
|---|---|---|---|---|---|---|---|
| | Adult Stays | Average Charge per Stay | Total Charges | Adult Stays | Average Charge per Stay | Total Charges | |
| Medicare | 153,617 (38%) | $31,459 | $4,832,667,360 | 47,548 (41%) | $23,377 | $1,111,523,454 | $5,944,190,814 |
| Medicaid | 57,842 (14%) | $20,277 | $1,172,868,553 | 21,879 (19%) | $22,767 | $498,126,762 | $1,670,995,315 |
| Health Maintenance Organization | 35,442 (9%) | $24,279 | $860,510,637 | 8,771 (8%) | $20,663 | $181,232,985 | $1,041,743,622 |
| Commercial Insurance | 70,028 (17%) | $23,460 | $1,642,886,059 | 13,511 (12%) | $21,783 | $294,314,294 | $1,937,200,353 |
| Health Care Service Contractor | 65,622 (16%) | $26,982 | $1,770,580,228 | 12,657 (11%) | $24,453 | $309,501,849 | $2,080,082,077 |
| Other | 24,837 (6%) | $27,025 | $671,227,835 | 10,998 (10%) | $21,830 | $240,083,922 | $911,311,757 |

88.     During a July 2013 conversation with Relator, Kerri Francis, former Director of

Utilization Management at Bellaire, confirmed that Bellaire was not following the correct

Medicare discharge standard.  She stated that the standard used to determine whether Medicare

patients should stay in the hospital longer is basically, "Is he benefitting from the program? . . .

all we have to show with Medicare is that they are benefitting from treatment."  According to

Francis, "all Medicare requires" is that the "patient is getting better," that the patient "can

continue to benefit from further treatment."

89.     Keeping Medicare patients in the hospital as long as possible and longer than was

medically necessary was an affirmed company-wide policy.  Defendants discharge patients

pursuant to a Discharge Plan.  For private patients, this Plan is begun on the day the patient is

---

[5] Accessed at http://www.wsipp.wa.gov/rptfiles/09-04-3401.pdf.

admitted.  For government insured patients, this Plan is delayed into well into the patient's stay and is begun only when it is clear the LOS cannot be extended any longer.

90.     From the time Relator began his employment at Bellaire in June 2011, he has witnessed Bellaire management misinforming doctors of the Medicare criteria for continued stay in a psychiatric hospital.  Gary Massey, Clinical Director of Bellaire, directly told Relator that the criteria is "whether the patient could benefit from being in the hospital" and that a non-Medicare patient should be stabilized as soon as possible and then discharged, while a Medicare patient should be kept as long as possible.

91.     CEO John Nekic told Relator that Martin Schappell, Regional UHS VP, mandated (as per UHS corporate wide policy) that no more than 10% of the currently hospitalized Medicare patients be discharged on a given day.

92.     Relator was told numerous times by Nekic and Schappell that all doctors needed to make sure that the hospital had extended lengths of stay for the Medicare patients and a minimum number of unpaid days for the non-Medicare patients.  It was openly stated at the department meetings held after the Flash Meetings and by the Utilization Director when speaking with doctors each day that it was the treating physician's responsibility to make the private insurance patients stable as quickly as possible so that they could be released as soon after admission as possible because private insurance only covered a minimal number of inpatient hospitalization days.  On the other hand, with Medicare patients, treating physicians needed to see that those patients stayed as long as possible for UHS to reap the maximum economic gain from the patient's hospitalization.

93.     In a conversation with Relator on or around June, 2013, Kevin Quicho, former Intake Director at Bellaire, stated that John Nekic (Bellaire's former CEO) always wanted to get

37

Medicare patients admitted to Bellaire because these patients did not need pre-authorization and you could "keep them for as long as you want[ed]." He stated that Nekic felt that "[a]ll the docs have to do is sign off every 7 days."

94.     In a conversation with Relator on or around August, 2013, CEO Drew Martin stated that for patients with no insurance "I'm really looking for a targeted length of stay of around three [days], if possible," but for patients in the geriatric department (called the "Gero" department) who primarily have Medicare, he is targeting 14 days for the ideal length of stay. Martin stated that in August 2013, CMS audited Bellaire and asked him to pull 14 patients' charts going back to 2010. Martin admitted to Relator that in reviewing these charts, he noticed that some of the patients' lengths of stay at the hospital were "excessive," citing one example where a patient had stayed for 33 days at Bellaire.

95.     On a routine basis, Bellaire is not discharging patients on the weekends, contributing to patients' medically unnecessary lengths of stay. Interim CEO Drew Martin is aware that some patients are not being discharged when medically necessary if the day of discharge is Saturday or Sunday. In a conversation with Relator in mid-October 2013, Martin stated that often patients would be listed on the discharge calendar for Saturday and then on Monday they would still be in the hospital.

96.     During a July 2013 conversation with Relator, Kerri Francis, former Director of Utilization Management at Bellaire, described Nekic's single-minded approach to company revenues at the expense of patients as "focus on the days, the days, the days, the days, the days." She stated that he pressured the attending physicians to keep Medicare patients in the hospital for as long as possible and would often call the physicians directly and question them as to why they were discharging certain patients.

c. **UHS Closely Monitored LOS Metrics to Further Its Scheme and Maximize Profits.**

97.    At the daily Bellaire Flash Meetings with UHS corporate and senior staff described in ¶¶ 60-62 above, increasing Medicare patient LOS was a significant focus and source of discussion. Relator was present at Flash Meetings three times over the last 2 years (in October and November 2012 and February 2013) in his capacity as Executive Medical Director. If the daily Flash Report, which included the LOS of each Medicare patient then hospitalized at Bellaire, showed a decline in the total number of Medicare patients and their current LOS on a given day, then this was highlighted at the Flash Meeting held the following morning, and the importance of Medicare LOS and ways to increase it were discussed. In addition, each patient hospitalized was reviewed, with his insurance and LOS discussed. The total number of patient days for each type of insurance was examined and compared to the budgeted amount of patient days for each type of insurance. In addition, based on these insurance metrics alone, those present at the meeting decided if the currently hospitalized patients should stay hospitalized, without any input from the treating physicians or any other doctor.

98.    After the daily Flash Meetings and as result of the discussions held therein, the hospital staff holds its own department meetings and instructs the junior staff (*i.e.* head nurse, lead therapist, counselors, case managers, discharge planners) when the currently hospitalized patients should be discharged.

99.    To reinforce its goals, UHS hospitals sent each of its doctors an individualized daily Physician Census Spreadsheet that showed his or her patients' names, each patient's insurance (Medicare, Medicaid or the name of the private insurance company), the admit date, the date through which the patient was authorized to stay (for Medicare, it states N/A because there was no limit on the LOS), and the prospective discharge date. These reports allowed the

39

doctors to keep track of their patient's LOS on a daily basis, so they could ensure that their Medicare patients stayed longer and their private insurance patients discharged sooner. They show at a glance that private insurance patients only stay for a few days and then are discharged while the Medicare patients have a much longer LOS and do not even have an anticipated date of discharge.

100.    In a July 2013 conversation with Relator, Bellaire attending physician Dr. Kambhapatti noted that Bellaire's Clinical Director, Dr. Massey, reviews his census and that Massey is "happy . . . [because his] census is looking good."

101.    UHS maintains Discharge Calendars that list, *inter alia*, the names of patients being discharged on a given day, their insurance providers and their LOS. An analysis of the average LOS of private insurance patients vs. the average LOS of government-insured patients listed on these Calendars shows that the government insured patients are being hospitalized at UHS' Bellaire hospital for significantly longer periods than their private insurance counterparts. The hospital stay is significantly higher in Medicare patients vs. non-Medicare patients because UHS is driven by profits and not by delivering appropriate and quality care to its patients.

102.    Certain UHS physicians are promoted to the position of Medical Director, which requires minimal additional hospital duties that take about 12 additional hours per week, but includes the payment of stipend of approximately $16,500 per month. Not surprisingly, there is a great difference between the LOS of patients being treated by the Medicare Directors and the LOS of those patients being treated by non-medical director physicians. A doctor who abided by the scheme and whose LOS of his Medicare patients went up and stayed up was made a Medical Director. Medical Directors who did not continue to comply with the scheme were terminated from that position and lost the stipend (*e.g.,* Dr. Eileen Starbranch and Dr. Krishna Kambapatti).

103.     Relator was told numerous times by the CEO that if doctors did not keep enough Medicare patients in the hospital or if their Medicare patients' LOS dropped, their job was in jeopardy.  Bellaire kept track of "Under Utilized Days by Physician" [DOC 56277 August 2011] to inform physicians of days a patient could have been hospitalized but was not. On September 20, 2012, CEO John Nekic wrote an email to "Leadership" stating "Our specialty programs are suffering...It also means that we are not so strict with our admission criteria that we are turning away business...We master this and bring our census up in our specialty programs then we are ahead of our competitors...I will be speaking with each of you individually about your areas to assure we move ahead with this vision."

#### d.     Examples of Patients with Fraudulent Lengths of Stay.

104.     This tremendous pressure from the Company caused doctors to distort their medical judgment and fabricate diagnoses to increase their Medicare patients' LOS.  Even though boilerplate diagnostic language may have been placed in charts to seemingly justify continued treatment in an inpatient psychiatric hospital, a deeper evaluation of those patient files reveals that the patient's true condition did not meet the standards required for admission or continued inpatient treatment, and Medicare was falsely billed as a result.  Patient Nos. 1 -5  are examples of UHS patients who were kept hospitalized at Bellaire in violation of Medicare rules and regulations and as part of the fraudulent LOS scheme outlined above, and whose continued inpatient care at Bellaire was billed to and paid by Medicare in violation of the State and Federal False Claims Acts.  Specifically,

- On page 91 of the chart of Patient No. 1, it states that the patient's primary issue is Social Anxiety and Mild Depression, and on page 95 it states "patient will not hurt self or others upon discharge" while there is no indication that he ever intended to do so.  On page 136, Dr. Reichmann wrote Progress Notes dated 9/8/12 and 09/10/12 (as covering MD) that denies any "SI/HI or AVH" and that the plan was to continue to "monitor" and give triple antibiotic for a facial rash.

41

After many progress notes indicating no serious psychiatric illness, Dr. Reichmann wrote on 09/14/2012 to discharge the patient two days later - on 09/16 –without any justification for the continued length of stay. On page 137, it states that on 09/13/12, the patient's wife indicated that she would pick up the patient on 09/16, such that the patient was kept hospitalized for transportation reasons only

- On April 5, 2012, Director Kerri Francis emailed Relator that "[Patient No. 10's] last MCR [Medicare] day is 04/06/12. We need to discharge him on 04/07/12." Thus, the patient's discharge date was dictated by his medical coverage and not a medical reason.

- On October 3, 2012, Director Kerri Francis emailed Relator that "[Patient No. 11] is funded by Medicaid. I understand his diagnosis of record is Anxiety d/o [disorder]. Wondering if you would consider changing that to Major Depressive D/O due to the patient's suicidality."

105.    And some patient files did not even contain the necessary boilerplate diagnostic language for continued hospitalization, such that the patient should have been promptly discharged. The charts of Patient Nos. 2 – 5 are examples of this.

### e.   Relator Took His Concerns Directly to Bellaire and UHS Corporate Management.

106.    Relator first raised his concerns with UHS policies regarding admissions and LOS in a meeting in or around September 2012 with Bellaire CEO Nekic and Senior Vice President of UHS Schappell. Schappell iterated to Relator the erroneous standard that Medicare patients should be kept hospitalized as long as they could benefit and also stated that private patients should not be kept longer than days allowed so that the hospital did not lose money.

107.    In or around November 2012, Relator had an opportunity to speak privately with Schappell at a Board meeting and again raised his concerns. Schappell stated that it was not his issue to deal with and that in the future Relator should raise his concerns through the corporate chain of command, which meant to bring them to Bellaire CEO Nekic. Nekic later reiterated to Relator that all concerns should be reported to him directly.

108.    Relator put his concerns in writing in a December 7, 2012 letter to CEO Nekic:

"This is to further our discussion about the patients LOS.  I understand that Martin has asked us to specifically have extended Medicare length of stay and not deny any Medicare patients admissions. . . .  I am also troubled by that because our difference in length of stay for Medicare patients versus non-Medicare patients is drastically high.  You discussed about the UHS philosophy and that our job would be in line, in case the census or LOS drops. . .  I am seeing patients are basically babysitting at a five star hotel's cost.   We have minimal interventions and extended stay even after Medicare patients don't meet the criteria of hospitalization. . .  I also understand that you feel it may be fruitless to set up meeting with Martin because he is following the corporate policies ..."

109.    Relator phoned Schappell in December 2012 to again raise his concerns. Schappell told him to go through Bellaire CEO John Nekic.

110.    Relator voiced these same concerns in a letter dated January 30, 2013 that he addressed to Martin Schapell, and gave to Nekic (asking Nekic to give it to Schappell, which Nekic later confirmed he did).

111.    He reiterated his concerns again in a letter dated February 27, 2013 addressed to CEO Nekic.

112.    In or around April 2013, after CEO Nekic was fired, Relator had a 7:30 AM phone call with Schappell during which Schappell told Relator that Relator's job was on the line, and that Relator needed to follow the UHS policy of maximizing the LOS of Medicare patients and that any concerns should be directed to interim Bellaire CEO Drew Martin.

113.    On May 20, 2013, Relator sent a letter directly to Schappell stating he was forwarding the memos he wrote to Nekic expressing his concerns about Bellaire.

114.    In or around July 2013, Schappell came to Bellaire for meetings that included interim CEO Martin.  Relator spoke directly with Schappell and asked him to meet privately. Schappell instructed Relator to set up the meeting through his secretary. When Relator attempted to do so, the secretary was evasive and would not set up the meeting.  Relator then gave Drew

Martin copies of Relator's prior correspondence raising his concerns and asked Martin to give them to Schappell.

115.    On July 15, 2013, Relator was demoted from his position as Medical Director.

### f.    Bellaire's Utilization Review Committee Was a Sham.

116.    42 CFR § 482.30 requires each hospital participating in Medicare and Medicaid to have in effect a utilization review (UR) plan and to appoint a UR Committee of at least two doctors to review "services furnished by the institution and by members of the medical staff to patients entitled to benefits under the Medicare and Medicaid programs." This requires each such hospital to review for each Medicare and Medicaid patient the medical necessity of admission, the duration of stay, and professional services furnished (including drugs and biologicals). 42 CFR § 482.60 specifically makes this requirement applicable to psychiatric hospitals. In hospitals paid under the prospective payment system (PPS), such as psychiatric hospitals, the UR Committee must review all cases reasonably assumed by the hospital to be outlier cases because the extended length of stay exceeds the threshold criteria for the diagnosis, as described in § 412.80(a)(1)(i).

117.    States have their own utilization review requirements as well. *See, e.g.,* PA Code § 1151.76: Continued stay review requirements ("(a) The utilization review committee or its representative shall review the need for continued stay of each recipient admitted to the inpatient psychiatric facility. . .")

118.    Bellaire's Utilization Review Committee was a sham. Bellaire held no such required UR Committee meetings. As Executive Medical Director, Relator would have been notified of any such meetings and would have attended any if they had occurred.

119.    Bellaire did maintain a UR department, directed by Kerry Francis.  It existed and operated solely to maximize the LOS of, and corresponding revenues from, private patients.  The UR department would call private insurance companies every day to get more days authorized for a hospitalized patient covered by private insurance.  When a private insurance company did not authorize additional patient hospitalization days, the issue went to "peer review", which is when an independent doctor assesses the file and makes a determination.  There was no such mechanism for Medicare patients.  The UR committee simply did not review Medicare LOS.

### 4.    UHS Corporate Was Directly Involved in Managing Admissions and Lengths of Stay so as to Maximize Its Profits

120.    UHS' fraudulent admission and retention of government insured patients was knowingly conducted on a nationwide basis.  UHS directed the admissions and LOS frauds from its corporate offices and through its regional directors, who received and reviewed relevant admission and LOS metrics by hospital and conducted and/or participated in daily hospital Flash Meetings during which they micromanaged admission and continued stay decisions of Medicare/Medicaid patients.

121.    While each department in a UHS hospital had its own director, UHS corporate also had a separate director who oversaw that department for all UHS hospitals.  For example, while Bellaire had its own director of nursing, UHS corporate had a separate director of nursing – Letty Lozano, Director of Clinical Services – who had high level responsibility for UHS nursing policy throughout the UHS hospital system.  UHS also maintained its own Director of Intake (Tasha Hoffman) to oversee UHS hospital admission policies and ensure UHS hospitals maximized revenues through increased admissions and longer LOS for Medicare patients.  Furthermore, the Senior Vice President Regional Directors reported to a UHS Behavioral Health

President (Debra Osteen), who oversaw and further directed the admission and LOS frauds from UHS' corporate offices.

122.    UHS hospitals produced and circulated Daily Flash Reports to UHS Regional Directors (which was UHS Senior Vice President Martin Schappell for Bellaire).  These reports detail the total number of patients in the hospital and list patient names by hospital unit and show for each patient, *inter alia*, the primary insurance payor, LOS and admitting diagnosis.

123.    Census Reports, which list the number of inpatients for each day of the month by psychiatric unit (e.g. youth, adult, women, etc.), and shows the Average LOS for the month, the budgeted average monthly LOS and the variance between the two, were also circulated.   They also include Instructions from UHS corporate to the individual hospital explaining how to fill out the Census Report form and stating, "Distribution each business day by noon eastern time" to VP, Regional CFO, and three other UHS employees.

124.    The daily Flash Meetings were attended by, *inter alia*, UHS Corporate staff from UHS headquarters (Martin Schappell for Bellaire), who attended by telephone or in person.  The regional corporate business (in Denton, Texas for Bellaire) office also participated.  The goals of these Flash Meetings was and is to monitor the admissions, discharges and LOS of government-insured patients, particularly those with Medicare because of Medicare's generous per diem rates, generous allowances for lengths of stay and minimal restrictions on a patient's care and continued hospital stays.

125.    In a July 2013 conversation between Relator and Bellaire's Interim CEO Martin, Martin revealed that UHS Vice President Martin Schappell contacts Martin on a daily basis to check on the hospital's census and patient LOS, and that other UHS Vice Presidents also contact Martin to ensure that Bellaire is continuing to keep its Medicare census high.  In fact, if

Bellaire's census drops or the LOS decreases, CEO Martin said that he immediately hears from UHS corporate – by email, telephone or text message.  Martin also explained to Relator that UHS has not offered him a permanent CEO position at Bellaire because the Company is determining whether he can maintain a high number of Medicare patients in the hospital for a long LOS and a high census in general.

**5.**   **Medical Record Documentation Does Not Meet CMS Requirements and Does Not Support the Medical Necessity of Patient Admissions and Lengths of Stay.**

126.    On a consistent basis, the documentation in patients' medical records does not support the medical necessity of patients' admissions into Bellaire or patients' continued lengths of stay at the hospital.

127.    This is contrary to Medicare's very detailed medical records requirements.  *See* Medicare Benefit Policy Manual, Ch. 2 – Inpatient Psychiatric Hospital Services, §30; 42 C.F.R. § 482.61.  In order to be paid a per diem rate by Medicare, IPFs must maintain medical record documentation meeting very specific requirements.  42 C.F.R. § 412.27(c).  The medical record documentation must allow the government to determine "the degree and intensity of the treatment provided to individuals who are furnished services in the [IPF]." 42 C.F.R. § 482.61.  That is, the medical records must include the following:

- **Assessment/diagnostic data**:  this includes, *inter alia*, a provisional or admitting diagnosis must be made on every patient at the time of admission and the reasons for admission must be clearly documented as stated by the patient and/or others significantly involved.  Medicare Manual Ch. 2, § 30.1; 42 C.F.R. § 482.61(a).

- **Psychiatric evaluation**:  this must be completed within 60 hours of admission; include a medical history; contain a record of mental status; note the onset of illness and the circumstances leading to admission; describe attitudes and behavior; estimate intellectual functioning, memory functioning and orientation; and include an inventory of the patient's assets in descriptive, not interpretive fashion.  Medicare Manual Ch. 2, § 30.2; 42 C.F.R. § 482.61(b).

47

- **<u>Certification and recertification by a physician</u>**: As discussed in ¶45 above, a physician must sign a certification at the time of admission as well as recertify on as of the 12th day of admission (and at least 30 day intervals thereafter) that "the services were and continue to be required for treatment that could reasonably be expected to improve the patient's condition." Medicare Manual, Ch. 2, §§ 30.2.1.1-30.2.1.2. Because many patients did not meet the criteria for continued stay in the hospital, the corresponding recertifications were false.

- **<u>Treatment plan</u>**: each patient must have an individualized, written treatment plan which includes, *inter alia*, short- and long-term goals; adequate documentation to justify the diagnosis and the treatment and rehabilitation activities carried out; and the treatment received by the patient must be documented in such a way to assure that all active therapeutic efforts are included. Medicare Manual, Ch. 2, § 30.2; 42 C.F.R. § 482.61(b).

- **<u>Progress notes</u>**: must be recorded by the doctor or other health care provider and "must contain recommendations for revisions in the treatment plan as indicated as well as precise assessment of the patient's progress in accordance with the original or revised treatment plan." Medicare Manual, Ch. 2, § 30.4; 42 C.F.R. § 482.61(d).

- **<u>Discharge plan</u>**: the patient's medical record "must have a discharge summary that includes a recapitulation of the patient's hospitalization and recommendations from appropriate services concerning follow-up or aftercare as well as a brief summary of the patient's condition on discharge." Medicare Manual, Ch. 2, § 30.5; 42 C.F.R. § 482.61(b).

128.     Relator has numerous examples of Medicare patients' medical records which do not meet these requirements justifying admission and prolonged lengths of stay. For example, the medical records for Patient Nos. 2-7 and Nos. 16-18 are all grossly inadequate and lacking in one or more of the requirements outlined above.

### 6.     <u>UHS Billed For, But Did Not Provide, the Required Active Treatment.</u>

129.     Medicare provides strict guidelines as to the treatment a patient in an IPF must receive in order for the provider hospital to receive a per diem payment.

130.     "Payment for IPF services is to be made only for 'active treatment' that can reasonably be expected to improve the patient's condition. To assure that payment is made only under such circumstances, the law includes certain requirements that must be met before the

services furnished in an IPF can be covered, including medical necessity and certification."
Medicare Manual, Ch. 2, § 30.2.2.

131.    For services in a hospital to be designated as "active treatment," they must be:

- provided under an individualized treatment or diagnostic plan;
- reasonably expected to improve the patient's condition or for the purpose of diagnosis; and
- supervised and evaluated by a physician . . .

"The fact that a patient is under the supervision of a physician does not necessarily mean the patient is getting active treatment. For example, medical supervision of a patient may be necessary to assure the early detection of significant changes in his/her condition; however, in the absence of a specific program of therapy designed to effect improvement, a finding that the patient is receiving active treatment would be precluded." *Id.* § 30.2.2.1.

132.    "The services must be provided in accordance with an individualized program of treatment or diagnosis developed by a physician in conjunction with staff members of appropriate other disciplines on the basis of a thorough evaluation of the patient's restorative needs and potentialities. The plan of treatment must be recorded in the patient's medical record in accordance with 42 CFR 482.61, Conditions of Participation for Hospitals." *Id.* § 30.3.

133.    "The services provided must reasonably be expected to improve the patient's condition or must be for the purpose of diagnostic study. . . the treatment must, at a minimum, be designed both to reduce or control the patient's psychotic or neurotic symptoms that necessitated hospitalization and improve the patient's level of functioning." *Id.* § 30.3.2.

134.    The following services do not represent reasonable and medically necessary inpatient psychiatric services and coverage is excluded under Title XVIII of the Social Security Act, Section 1862(a)(1)(A): "Services which are primarily social, recreational or diversion activities, or custodial or respite care. . . "

135.     UHS keeps patients hospitalized who meet the standard for discharge in order to increase its Medicare revenues, and those patients hospitalized for longer than their true illness (as opposed to their fabricated diagnoses) requires no longer receive, and many have never received, "'active treatment' that can reasonably be expected to improve the patient's condition" as that term is defined with all of the attendant legal requirements as set forth above.  Patient Nos. 1 – 5 are examples of this.  Specifically, for Patient No. 1, the chart shows that no therapy intervention was done as patient was documented to have not attended any groups and no nursing intervention was done.  The patient rounds progress notes consistently indicated no distress, no danger to self or others, no aggression, no suicidal or homicidal gestures, no decompensated delusions, no acute psychiatric condition, no seclusions, and no restraint needed.

136.     Many of the treatments rendered are unrelated to the patients' illnesses and are "primarily social, recreational or diversion activities" for which UHS bills Medicare and is paid, in violation of Medicare payment rules.  For example, group therapy sessions often consist of patients sitting together and watching television rather than being engaged in any therapeutic process.  This is true for both UHS hospitals and its PHPs.

137.     A patient's discharge is often delayed by post-hospitalization placement problems, *e.g.* the patient's mother or the group home refused to take the patient back.  Fictitious entries are placed in charts, such as the patient is aggressive or agitated, when the real issue is that the patient simply has nowhere to go.  It is illegal to bill Medicare for "active treatment" when the hospitalization is due only to placement problems.

138.     The following are examples of patients whose discharges were delayed not because they needed additional treatment, but rather because of post-discharge placement problems:

- On March 20, 2012, Director Kerri Francis sent an email to Relator stating "Please move [patient] d/c [discharge] to 3/21/12. Her placement cannot take her until tomorrow."

- On March 16, 2012, Director Kerri Francis sent an email to Relator stating "...I spoke with probation officer and we need to keep this lady until at least Wednesday so we can get a good d/c [discharge] plan in place for her. Please work your magic to keep her."

- On September 4, 2012, Director Kerri Francis sent an email to Relator stating "I'm wondering if you would push back [patient]. The patient's mother has decided that he cannot come home."

- In October 2013, a Bellaire Medicare patient had a substance abuse problem and Child Protective Services wanted her to be placed in a rehabilitation program. Relator discharged her several times, but because she did not have post-discharge housing, the hospital did not discharge her but improperly kept her as an inpatient and subsequently billed Medicare.

139.    Relator refused to participate in this scheme and when discharge was delayed by post-hospitalization placement problems for one of his patients, he resigned from her care. The patient was then transferred to the care of Dr. Rafique (currently the Medical Director of Bellaire).

140.    UHS hospitals use various other tactics to delay the discharge of Medicare patients, increase their LOS, and bill Medicare for the continued hospitalization even though no "active treatment" was being provided. If a Medicare patient directly requests a discharge, he or she is often threatened with involuntary commitment even though there is no medical basis to do so. Frequently, intramuscular injections (known as Chemical Restraint) are given to Medicare patients to discourage them from requesting discharge, to incapacitate them so they are unable to request discharge, or to convince them that they are too ill to leave the hospital.

141.    Relator wrote discharge orders for Medicare patients at Bellaire which were simply ignored and overridden, including for Patient Nos. 12 and 13. On April 25, 2013, Relator wrote discharge orders for a Medicare patient but received an email from Kerri Francis, Director

51

of Utilization Management, overriding his medical decisions and stating "I have taken [Patient No. 14] off the d/c [discharge] calendar for now."

142.    UHS hospitals also admitted, treated and billed Medicare for patients with mental retardation and dementia.  These patients present with behavioral problems and not mental illness and such patients should not have been admitted into an inpatient psychiatric hospital. Any "active treatment" rendered to them was unlawfully billed to and paid by Medicare and other government insurance programs.  For example, Patient No. 7 had been diagnosed with mental retardation and schizophrenia and was kept in Bellaire for 31 days without any real justification.  The psychiatric evaluation and the progress notes from all disciplines are grossly inadequate, and there was minimal intervention.

143.    UHS hospitals also admitted chemically dependent Medicare patients to their Detox and Rehabilitation programs, and then falsified their diagnoses and up-coded their treatment to active treatment for mental illness in order to receive the much greater per diem Medicare payment.

144.    Patient Nos. 2, 4 and 6 are examples of this.  Specifically, Patient No. 6 was admitted for alcohol and crack abuse, even though he had no documented withdrawal symptoms. He was kept in the hospital without any psychiatric justification.  The psychiatric evaluation and progress notes from all the disciplines are grossly inadequate, and there was minimal intervention.

145.    According to Andre Bennett, Bellaire's Director of Business Development, Bellaire is currently not doing patient treatment programs.  As he expressed to Relator over dinner in mid-October 2013, he thinks Bellaire needs to "truly do some programming and work with [patients]."  Further, Bellaire's CEO Drew Martin expressed a similar view in a

conversation with Relator in mid-October 2013; in essence, he stated that the treatment teams were worthless.

### 7.   UHS Recruited Patients for Hospitalization Who Did Not Meet the Medical Necessity Criteria for Admission

146.   In order to boost their Medicare billings, Bellaire and other UHS hospitals engaged in marketing and diagnostic practices designed to increase the number of patients hospitalized at any given time and the corresponding per diem payments the hospital received.

147.   Each UHS hospital, including Bellaire, has a Mobile Assessment Team (MAT) whose purpose is to go to hospital Emergency Rooms and mental health group homes to evaluate prospective patients under the guise of triage/crisis intervention.   In nearly all cases, such prospective patients are admitted to the in-patient psychiatric hospital.

148.   MAT clinicians also go to group homes to solicit patients directly to be admitted to the psychiatric hospital.  Hospitalization can be a welcome alternative to a group home, which can be an inhospitable environment.  Some patients not in need of hospitalization, who have refused to voluntarily accompany the MAT to the hospital, have been involuntarily committed to the hospital, and the group home has been given a corresponding monetary kickback for supplying the patient.

149.   The MAT historically has charged nothing for performing its mobile assessment services.  This has recently been increased to the nominal sum of $100.  Four UHS hospitals in the Houston area (Bellaire, Cypress Creek, West Oaks and Kingwood Pines) have recently combined their MAT teams to increase their productivity.

150.   After a patient is discharged, the Bellaire marketing department keeps tabs on the patient, including his whereabouts and contact information. When the census (number of filled beds in a hospital at a given time) is low, Bellaire contacts a prior patient and asks her to come

back to be admitted into the hospital.  The patient is likely living in a sometimes stressful group home setting and welcomes the respite.  One patient told Relator that Bellaire CEO John Nekic telephoned him personally to request that he check back in to the hospital.  Relator confronted Nekic about this, who responded, "Our census was low and I was concerned about him."  This occurred in September/October 2012.

151.    Upon information and belief, Relator believes these practices occurred at UHS hospitals around the country as well.

152.    These practices resulted in fraudulent admissions and continued stays of unqualified patients, billing Medicare for hospitalizations that were not medically necessary, and creating false documents to make it appear as if legitimate services were being rendered.

### 8.    UHS Caused Illegal Billings to be Submitted to Medicare Part D

153.    The Medicare per diem amount paid to a UHS hospital for active treatment of a hospitalized psychiatric patient also covers, in addition to all of the services and treatments rendered, all of the patient's medication that may be covered under Medicare Part A.  However, in order to save itself from having to spend a portion of the Medicare per diem payment on the cost of those drugs and thereby increase its profits, the UHS hospital separately bills Medicare for the most expensive drugs a patient needs under Medicare Part D.  These drugs include Sustenna ($1800 per injection), Latuda (Lurasidone) ($800 for 30 pills) and Relprevv ($1800 per injection) and Fanapt ($800 for 30 pills).  At Bellaire, the treating doctor would write prescriptions for these drugs and give them to Bellaire's Pharmacy Director Ablah Tarver, who would then fax them to a local, independent pharmacy called Joe's Pharmacy, which would then bill Medicare directly and then deliver the medications to the hospital.  Because the hospital had not yet billed Medicare for the patient's stay in the hospital, Medicare was unaware that the

54

patient was hospitalized when it was billed for drugs under Medicare Part D.   This fraud occurred, for example, with Patient No. 17, a 39 year old male, who filled a prescription from an outside pharmacy under Medicare Part D while he was an inpatient at Bellaire.

### 9.   UHS Illegally Used Chemical Restraint to Increase Patients' Lengths of Stay.

154.   Doctors at UHS Hospitals inject a cocktail of Haldol 10 mg/Ativan 1 mg/Benadryl 50 mg into Medicare patients who no longer require active treatment for mental illness, are requesting discharge or have not agreed to continue inpatient treatment, in an effort to extend their Length of Stay at the psychiatric hospital and in violation of 42 CFR § 482.13(e)(1)(B).

155.   In addition, the injection is given without the physician filling out and placing in the patient's chart the required documentation on a specified form, which form is required every single time the injection is given.   Thus, the medical Order to give the injection is noted in the chart, but the required from after the injection is given is absent.

156.   Relator specifically complained of this practice to Bellaire's former CEO John Nekic in a letter dated February 27, 2013.

### 10.   UHS Admitted Patients into PHPs Who Did Not Meet the Medical Necessity Criteria for Admission.

157.   UHS runs Partial Hospitalization Programs (PHPs), which are combined inpatient and outpatient mental health treatment programs where the patient does not require 24-hour per day supervision in a locked psychiatric hospital, but lives in a group home and goes to an outpatient treatment center for treatment.   The patient is an individual who receives hospital services during the day and is not expected to be lodged in the hospital at midnight.   Bellaire itself owns two such outpatient facilities where PHP patients are treated:

- Aldine Outpatient Center, 2814 Aldine Bender Houston, TX 77032

- Tomball Outpatient Center, 28437 Tomball Parkway Tomball, TX 77375

Dr. Larry Flores was the Medical Director of each of these outpatient facilities at the time Relator was Executive Medical Director of Bellaire, with ultimate responsibility for Bellaire's PHP programs.

158.    PHPs are structured to provide intensive psychiatric care through active treatment that utilizes a combination of the clinically recognized items and services described in §1861(ff) of the Social Security Act. The treatment program of a PHP closely resembles that of a highly structured, short-term hospital inpatient program. It is treatment at a level more intense than outpatient day treatment or psychosocial rehabilitation. Programs providing primarily social, recreational, or diversionary activities are not considered partial hospitalization. See Medicare Benefit Policy Manual: Chapter 6 - Hospital Services Covered Under Part B, § 70.3.  A program that only monitors the management of medication for patients whose psychiatric condition is otherwise stable, is not the combination, structure, and intensity of services which make up active treatment in a PHP. *Id.* § 70.3.A.

159.    Patients admitted to a PHP must be under the care of a physician who certifies the need for partial hospitalization and require a **minimum of 20 hours per week of therapeutic services**, as evidenced by their plan of care. The patients also require a comprehensive, structured, multimodal treatment requiring medical supervision and coordination, provided under an individualized plan of care, because of a mental disorder which severely interferes with multiple areas of daily life, including social, vocational, and/or educational functioning. Such dysfunction generally is of an acute nature. *Id.* § 70.31.B.1.

160.    Patients meeting benefit category requirements for Medicare coverage of a PHP comprise two groups: (1) those patients who are discharged from an inpatient hospital treatment program, and the PHP is in lieu of continued inpatient treatment; or (2) those patients who, in the

56

absence of partial hospitalization, would be at reasonable risk of requiring inpatient hospitalization. Where partial hospitalization is used to shorten an inpatient stay and transition the patient to a less intense level of care, there must be evidence of the need for the acute, intense, structured combination of services provided by a PHP. Recertification must address the continuing serious nature of the patients' psychiatric condition requiring active treatment in a PHP. *Id.* § 70.3.B.1.

161.    Partial hospitalization services that make up a program of active treatment must be vigorous and proactive (as evidenced in the individual treatment plan and progress notes) as opposed to passive and custodial. *Id.* § 70.3.B.2.

162.    Patients admitted to a PHP generally have an acute onset or decompensation of a covered Axis I mental disorder, as defined by DSM-IV or listed in Chapter 5 of the International Classification of Diseases (ICD), 10th Revision, which severely interferes with multiple areas of daily life. The degree of impairment will be severe enough to require a multidisciplinary intensive, structured program, but not so limiting that patients cannot benefit from participating in an active treatment program. *Id.* § 70.3.B.3.

163.    Medicare Part B covers partial hospitalization.  The following documentation is required for  Medicare reimbursement and is used by Medicare to determine whether the services provided were accurate and appropriate:

   a.   Initial Psychiatric Evaluation/Certification.--Upon admission, a certification by the physician must be made that the patient admitted to the PHP would require inpatient psychiatric hospitalization if the partial hospitalization services were not provided. The certification should identify the diagnosis and psychiatric need for the partial hospitalization. Partial hospitalization services must be furnished under an individualized written plan of care, established by the physician.

   b.   Physician Recertification Requirements.—

      • Signature – The physician recertification must be signed by a physician who is treating the patient and has knowledge of the patient's response to treatment.

• Timing – The first recertification is required as of the 18th calendar day following admission to the PHP. Subsequent recertifications are required at intervals established by the provider, but no less frequently than every 30 days.

• Content – The recertification must specify that the patient would otherwise require inpatient psychiatric care in the absence of continued stay in the PHP and describe the following:

> • The patient's response to the therapeutic interventions provided by the PHP;
>
> • The patient's psychiatric symptoms that continue to place the patient at risk of hospitalization; and
>
> • Treatment goals for coordination of services to facilitate discharge from the PHP.

c. Treatment Plan.--Partial hospitalization is active treatment pursuant to an individualized treatment plan, prescribed and signed by a physician, which identifies treatment goals, describes a coordination of services, is structured to meet the particular needs of the patient, and includes a multidisciplinary team approach to patient care. . .

d. Progress Notes.--Section 1833(e) of the Social Security Act prevents Medicare from paying for services unless necessary and sufficient information is submitted that shows that services were provided and to determine the amounts due. A provider may submit progress notes to document the services that have been provided. The progress note should include a description of the nature of the treatment service, the patient's response to the therapeutic intervention and its relation to the goals indicated in the treatment plan.

*Id.* § 70.3.B.5.

164.    Covered Services rendered pursuant to a PHP include:

• Individual or group psychotherapy;

• Occupational therapy;

• Services of other staff (social workers, psychiatric nurses, and others) trained to work with psychiatric patients;

• Drugs and biologicals that cannot be self-administered and are furnished for therapeutic purposes;

58

• Individualized activity therapies that are not primarily recreational or diversionary;

• Family counseling services for which the primary purpose is the treatment of the patient's condition;

• Patient training and education, to the extent closely and clearly related to the individuals care and treatment of his/her diagnosed psychiatric condition; and

• Medically necessary diagnostic services related to mental health treatment.

*Id.* § 70.3.B.2.

165.   UHS PHPs admitted, and sought and received Medicare payment for services rendered to, patients who did not meet the Medicare PHP admissions criteria of having an acute onset or decompensation of a covered Axis I mental disorder that required a comprehensive, structured, multimodal treatment requiring medical supervision and coordination, provided under an individualized plan of care, because the mental disorder severely interfered with multiple areas of daily life.  For example, Patient No. 14 was a 55 year old male with mental retardation, seizure disorder, diabetes and hypertension.  Notes in the chart are boilerplate and grossly inadequate, and do no indicate the medical necessity of being in the PHP program for over 5 months.

166.   UHS PHPs did not furnish the required minimum of 20 hours per week of therapeutic services for each patient, often only monitoring the management of medication for patients whose psychiatric condition is otherwise stable, or providing treatments that were often primarily social, recreational, or diversionary activities (such as watching television).

167.   UHS   PHPs   often   did   not   maintain   adequate   Initial   Psychiatric Evaluation/Certifications, Physician Recertifications, Treatment Plans and Progress Notes required by Medicare for payment for services rendered.

168.   UHS hospitals also paid kickbacks to group homes that supplied its PHPs with Medicare patients.  For example, if a UHS hospital was able to bill Medicare $230 for a day of

services rendered to a PHP patient supplied by a group home, that group home was paid a kickback of approximately $50. Sometimes the patient himself was paid a kickback directly. Doctors in such group homes in Houston and Miami have told Relator directly that they were receiving monetary kickbacks and payment of expenses, such as lunch. In addition to money, group homes received as kickbacks cigarettes, food, supplies (such groceries and toilet paper) and other direct payments of group home expenses. Employees in Bellaire's marketing department confirmed these facts to Relator. Relator himself was directly asked by a group home director for a kickback for sending patients to a Bellaire PHP, which Relator declined to give.

**COUNT I**

**FEDERAL FALSE CLAIMS ACT**
**31 U.S.C. §3729(a)(1)[1986] and**
**31 U.S.C. §3729(a)(1)(A)[2009]**

169.    Relator repeats and re-alleges each and every allegation contained in the paragraphs above as though fully set forth herein.

170.    Defendants knowingly presented or caused to be presented a false or fraudulent claim for payment or approval in violation of 31 U.S.C. §3729(a)(1)[1986] and 31 U.S.C. §3729(a)(1)(A)[2009].

171.    By virtue of the false or fraudulent claims that Defendants presented, the United States has suffered actual damages and is entitled to recover treble damages and a civil penalty for each false claim.

**COUNT II**

**FEDERAL FALSE CLAIMS ACT**
**31 U.S.C. §3729(a)(1)(B)[2009]**

172.    Relator repeats and re-alleges each and every allegation contained in the paragraphs above as though fully set forth herein.

173.    Defendants knowingly made, used or caused to be made or used, false records or statements material to false or fraudulent claims to the United States Government.  Defendants' false records or statements caused the Plaintiff States to submit false and inflated claims to the United States for the federal portion of Medicaid in violation of 31 U.S.C. §3729(a)(1)(B)[2009].

174.    In addition, Defendants knowingly made, used or caused to be made or used, false records or statements through patients' medical records and documentation material false or fraudulent claims to the United States Government for medically unnecessary stays at Defendants' facilities.

175.    By virtue of the false or fraudulent claims that Defendants caused to be presented, the United States has suffered actual damages and is entitled to recover treble damages and a civil penalty for each false claim.

## COUNT III

### THE CALIFORNIA FALSE CLAIMS ACT
### CALIFORNIA GOVERNMENT CODE §§ 12651, et seq.

176.    Relator re-alleges and incorporates by reference each and every allegation contained in the paragraphs above as though fully set forth herein.

177.    Through these acts, the Defendants have knowingly presented or caused to be presented false or fraudulent claims for payment to the State in violation of Section 12651(a)(1) of the Act.  Such claims caused actual damages to the State.

178.    Through these acts, the Defendants knowingly made, used, or caused to be made or used false records or statements material to a false or fraudulent claim to the State, in violation of Section 12651(a)(2) of the Act.  Such claims caused actual damages to the State.

61

## COUNT IV

## COLORADO MEDICAID FALSE CLAIMS ACT
### C.R.S. §25.5-4-303.5 ET SEQ.

179.     Relator re-alleges and incorporates by reference each and every allegation contained in the paragraphs above as though fully set forth herein.

180.     Through these acts, the Defendants have knowingly presented or caused to be presented false or fraudulent claims for payment to the State in violation of Section 25.5-4-305(1)(a) of the Act.  Such claims caused actual damages to the State.

181.     Through these acts, the Defendants knowingly made, used, or caused to be made or used false records or statements material to a false or fraudulent claim to the State, in violation of Section 25.5-4- 305(1)(b)  of the Act.  Such claims caused actual damages to the State.

## COUNT V

## CONNECTICUT FALSE CLAIMS ACT
### FOR PUBLIC ASSISTANCE PROGRAMS
### CONN. GEN. STAT. § 17b-301 et seq.

182.     Relator re-alleges and incorporates by reference each and every allegation contained in the paragraphs above as though fully set forth herein.

183.     Through these acts, the Defendants have knowingly presented or caused to be presented false or fraudulent claims for payment to the State in violation of Section 17b-301b(1) of the Act.  Such claims caused actual damages to the State.

184.     Through these acts, the Defendants knowingly made, used, or caused to be made or used false records or statements material to a false or fraudulent claim to the State, in violation of Section 17b-301b(2) of the Act.  Such claims caused actual damages to the State.

## COUNT VI

### THE DELAWARE FALSE CLAIMS AND REPORTING ACT
### DEL. CODE ANN. TIT. 6, § 1201 et seq.

185.    Relator re-alleges and incorporates by reference each and every allegation contained in the paragraphs above as though fully set forth herein.

186.    Through these acts, the Defendants have knowingly presented or caused to be presented false or fraudulent claims for payment to the State in violation of Section 1201(a)(1) of the Act.  Such claims caused actual damages to the State.

187.    Through these acts, the Defendants knowingly made, used, or caused to be made or used false records or statements material to a false or fraudulent claim to the State, in violation of Section 1201(a)(2) of the Act.  Such claims caused actual damages to the State.

## COUNT VII

### THE FLORIDA FALSE CLAIMS ACT
### FLA. STAT. §§ 68.082(2) et seq.

188.    Relator re-alleges and incorporates by reference each and every allegation contained in the paragraphs above as though fully set forth herein.

189.    Through these acts, the Defendants have knowingly presented or caused to be presented false or fraudulent claims for payment to the State in violation of Section 68.082(2)(a) of the Act.  Such claims caused actual damages to the State.

190.    Through these acts, the Defendants knowingly made, used, or caused to be made or used false records or statements material to a false or fraudulent claim to the State, in violation of Section 68.082(2)(a) of the Act.  Such claims caused actual damages to the State.

## COUNT VIII

### GEORGIA FALSE MEDICAID CLAIMS ACT
### GA. CODE ANN. §49-4-168.1 et seq.

191.    Relator re-alleges and incorporates by reference each and every allegation contained in the paragraphs above as though fully set forth herein.

192.    Through these acts, the Defendants have knowingly presented or caused to be presented false or fraudulent claims for payment to the State in violation of Section 49-4-168.1(a)(1) of the Act.  Such claims caused actual damages to the State.

193.    Through these acts, the Defendants knowingly made, used, or caused to be made or used false records or statements material to a false or fraudulent claim to the State, in violation of Section 49-4-168.1(a)(2) of the Act.  Such claims caused actual damages to the State.

## COUNT IX

### THE ILLINOIS WHISTLEBLOWER REWARD AND PROTECTION ACT
### 740 ILL. COMP. STAT. ANN. §§ 175/3 et seq.

194.    Relator re-alleges and incorporates by reference each and every allegation contained in the paragraphs above as though fully set forth herein.

195.    Through these acts, the Defendants have knowingly presented or caused to be presented false or fraudulent claims for payment to the State in violation of Section 175/3(a)(1) of the Act.  Such claims caused actual damages to the State.

196.    Through these acts, the Defendants knowingly made, used, or caused to be made or used false records or statements material to a false or fraudulent claim to the State, in violation of Section 175/3(a)(2) of the Act.  Such claims caused actual damages to the State.

## COUNT X

### THE INDIANA FALSE CLAIMS AND WHISTLEBLOWER PROTECTION ACT, INDIANA CODE 5-11-5.5-2 et seq.

197.    Relator re-alleges and incorporates by reference each and every allegation contained in the paragraphs above as though fully set forth herein.

198.    Through these acts, the Defendants have knowingly presented or caused to be presented false or fraudulent claims for payment to the State in violation of Section 5-11-5.5-2(b)(2), of the Act.  Such claims caused actual damages to the State.

199.    Through these acts, the Defendants knowingly made, used, or caused to be made or used false records or statements material to a false or fraudulent claim to the State, in violation of Section 5-11-5.5-2(b)(8), of the Act.  Such claims caused actual damages to the State.

## COUNT XI

### LOUISIANA MEDICAL ASSISTANCE PROGRAMS INTEGRITY LAW LA. REV. STAT. § 46:438.3 et seq.

200.    Relator re-alleges and incorporates by reference each and every allegation contained in the paragraphs above as though fully set forth herein.

201.    Through these acts, the Defendants have knowingly presented or caused to be presented false or fraudulent claims for payment to the State in violation of Section 46:438.3(A) of the Act.  Such claims caused actual damages to the State.

202.    Through these acts, the Defendants have knowingly presented or caused to be presented false or fraudulent claims for payment to the State in violation of Section 46:438.3(B) of the Act.  Such claims caused actual damages to the State.

## COUNT XII

### THE MASSACHUSETTS FALSE CLAIMS ACT
### MASS. ANN. LAWS. CH. 12, §§ 5B et seq.

203.    Relator re-alleges and incorporates by reference each and every allegation contained in the paragraphs above as though fully set forth herein.

204.    Through these acts, the Defendants have knowingly presented or caused to be presented false or fraudulent claims for payment to the State in violation of Section 5B(1), of the Act.  Such claims caused actual damages to the State.

205.    Through these acts, the Defendants knowingly made, used, or caused to be made or used false records or statements material to a false or fraudulent claim to the State, in violation of Section  5B(2), of the Act.  Such claims caused actual damages to the State.

## COUNT XIII

### MICHIGAN MEDICAID FALSE CLAIMS ACT
### MCLS §§ 400.607 et seq.

206.    Relator re-alleges and incorporates by reference each and every allegation contained in the paragraphs above as though fully set forth herein.

207.    Through these acts, the Defendants have knowingly presented or caused to be presented false or fraudulent claims for payment to the State in violation of Section 400.607(1), of the Act.  Such claims caused actual damages to the State.

208.    Through these acts, the Defendants knowingly made, used, or caused to be made or used false records or statements material to a false or fraudulent claim to the State, in violation of Section 400.607(3), of the Act.  Such claims caused actual damages to the State.

## COUNT XIV

### MINNESOTA FALSE CLAIMS ACT
### MINN. STAT. §15C.02 et seq.

209.    Relator re-alleges and incorporates by reference each and every allegation contained in the paragraphs above as though fully set forth herein.

210.    Through these acts, the Defendants have knowingly presented or caused to be presented false or fraudulent claims for payment to the State in violation of Section 15C.02(a)(1), of the Act.  Such claims caused actual damages to the State.

211.    Through these acts, the Defendants knowingly made, used, or caused to be made or used false records or statements material to a false or fraudulent claim to the State, in violation of Section 15C.01(a)(2), of the Act.  Such claims caused actual damages to the State.

## COUNT XV

### THE NEVADA SUBMISSION OF FALSE CLAIMS
### TO STATE OR LOCAL GOVERNMENT ACT
### NEV. REV. STAT. §§ 357.040 et seq.

212.    Relator re-alleges and incorporates by reference each and every allegation contained in the paragraphs above as though fully set forth herein.

213.    Through these acts, the Defendants have knowingly presented or caused to be presented false or fraudulent claims for payment to the State in violation of Section 357.040(1)(a), of the Act.  Such claims caused actual damages to the State.

214.    Through these acts, the Defendants knowingly made, used, or caused to be made or used false records or statements material to a false or fraudulent claim to the State, in violation of Section 357.040(1)(b), of the Act.  Such claims caused actual damages to the State.

## COUNT XVI

### NEW JERSEY FALSE CLAIMS ACT
### N.J. STAT. §2A:32C-3 et seq.

215.    Relator re-alleges and incorporates by reference each and every allegation contained in the paragraphs above as though fully set forth herein.

216.    Through these acts, the Defendants have knowingly presented or caused to be presented false or fraudulent claims for payment to the State in violation of Section 2A:32C-3(a), of the Act.  Such claims caused actual damages to the State.

217.    Through these acts, the Defendants knowingly made, used, or caused to be made or used false  records or statements material to a false or fraudulent claim to the State, in violation of Section 2A:32C-3(b), of the Act.  Such claims caused actual damages to the State.

## COUNT XVII

### THE NEW MEXICO MEDICAID FALSE CLAIMS ACT
### N.M. STAT. ANN. § 27-14-4A et seq.

218.    Relator re-alleges and incorporates by reference each and every allegation contained in the paragraphs above as though fully set forth herein.

219.    Through these acts, the Defendants have knowingly presented or caused to be presented false or fraudulent claims for payment to the State in violation of Section 27-14-A(1), of the Act.  Such claims caused actual damages to the State.

220.    Through these acts, the Defendants knowingly made, used, or caused to be made or used false records or statements material to a false or fraudulent claim to the State, in violation of Section  27-14-4A(2), of the Act.  Such claims caused actual damages to the State.

68

## COUNT XVIII

### NORTH CAROLINA FALSE CLAIMS ACT
### N.C. GEN. STAT. §1-607(A) et seq.

221.    Relator re-alleges and incorporates by reference each and every allegation contained in the paragraphs above as though fully set forth herein.

222.    Through these acts, the Defendants have knowingly presented or caused to be presented false or fraudulent claims for payment to the State in violation of Section 1-607(A)(1), of the Act.  Such claims caused actual damages to the State.

223.    Through these acts, the Defendants knowingly made, used, or caused to be made or used false records or statements material to a false or fraudulent claim to the State, in violation of Section 1-607(A)(2), of the Act.  Such claims caused actual damages to the State.

## COUNT XIX

### OKLAHOMA MEDICAID FALSE CLAIMS ACT
### OKLA. STAT. TIT. 63, §5053.1B et seq.

224.    Relator re-alleges and incorporates by reference each and every allegation contained in the paragraphs above as though fully set forth herein.

225.    Through these acts, the Defendants have knowingly presented or caused to be presented false or fraudulent claims for payment to the State in violation of Section 5053.1B(1), of the Act.  Such claims caused actual damages to the State.

226.    Through these acts, the Defendants knowingly made, used, or caused to be made or used false records or statements material to a false or fraudulent claim to the State, in violation of Section 5053.1B(2), of the Act.  Such claims caused actual damages to the State.

## COUNT XX

### THE TENNESSEE MEDICAID FALSE CLAIMS ACT
### TENN. CODE ANN. §§ 71-5-182(a) et seq.

227.     Relator re-alleges and incorporates by reference each and every allegation contained in the paragraphs above as though fully set forth herein.

228.     Through these acts, the Defendants have knowingly presented or caused to be presented false or fraudulent claims for payment to the State in violation of Section 71-5-182(a)(1)(A), of the Act.  Such claims caused actual damages to the State.

229.     Through these acts, the Defendants knowingly made, used, or caused to be made or used false records or statements material to a false or fraudulent claim to the State, in violation of Section 71-5-182(a)(1)(B), of the Act.  Such claims caused actual damages to the State.

## COUNT XXI

### TEXAS MEDICAID FRAUD PREVENTION ACT
### TEX. HUM. RES. CODE ANN. §36.002 ET SEQ.

230.     Relator re-alleges and incorporates by reference each and every allegation contained in the paragraphs above as though fully set forth herein.

231.     Through these acts, the Defendants have knowingly presented or caused to be presented false or fraudulent claims for payment to the State in violation of Section 36.002(1), of the Act.  Such claims caused actual damages to the State.

232.     Through these acts, the Defendants knowingly made, used, or caused to be made or used false records or statements material to a false or fraudulent claim to the State, in violation of Section 36.002(4), of the Act.  Such claims caused actual damages to the State.

## COUNT XXII

### THE VIRGINIA FRAUD AGAINST TAXPAYERS ACT
### VA. CODE §§ 8.01-216.3A ET SEQ.

233.   Relator re-alleges and incorporates by reference each and every allegation contained in the paragraphs above as though fully set forth herein.

234.   Through these acts, the Defendants have knowingly presented or caused to be presented false or fraudulent claims for payment to the State in violation of Section 8.01-216.3A(1), of the Act.  Such claims caused actual damages to the State.

235.   Through these acts, the Defendants knowingly made, used, or caused to be made or used false records or statements material to a false or fraudulent claim to the State, in violation of Section 8.01-216.3A(2), of the Act.  Such claims caused actual damages to the State.

## COUNT XXIII

### WASHINGTON HEALTH CARE FALSE CLAIM ACT
### WASH. REV. CODE §§ 48.80.030(1), (2), (3)

236.   Relator re-alleges and incorporates by reference each and every allegation contained in the paragraphs above as though fully set forth herein.

237.   Through these acts, the Defendants have knowingly presented or caused to be presented false or fraudulent claims for payment to the State in violation of Section 48.80.030(1), of the Act.  Such claims caused actual damages to the State.

238.   Through these acts, the Defendants have knowingly presented or caused to be presented false or fraudulent claims for payment for medically unnecessary services to the State in violation of Section 48.80.030(2), of the Act.  Such claims caused actual damages to the State.

239.    Through these acts, the Defendants knowingly made, used, or caused to be made or used false records or statements material to a false or fraudulent claim to the State, in violation of Section 48.80.030(3), of the Act.  Such claims caused actual damages to the State.

### REQUESTS FOR RELIEF

WHEREFORE, Relator, on behalf of the United States and the Plaintiff States, demands that judgment be entered in their favor and against Defendants for the maximum amount of damages and such other relief as the Court may deem appropriate on each Count.  This includes, with respect to the Federal False Claims Act, three times the amount of damages to the Federal Government plus civil penalties of no more than Eleven Thousand Dollars ($11,000.00) and no less than Five Thousand Five Hundred Dollars ($5,500.00) for each false claim, and any other recoveries or relief provided for under the Federal False Claims Act.

This Request also includes, with respect to the state statutes cited above, the maximum damages permitted by those statutes and the maximum fine or penalty permitted by those statutes, and any other recoveries or relief provided for under the State FCA's.

Further, Relator requests that he receive the maximum amount permitted by law of the proceeds of this action or settlement of this action collected by the United States and the Plaintiff States, plus reasonable expenses necessarily incurred, and reasonable attorneys' fees and costs. Relator requests that his award be based upon the total value recovered, both tangible and intangible, including any amounts received from individuals or entities not parties to this action.

## DEMAND FOR JURY TRIAL

A jury trial is demanded in this case.

Dated: November 6, 2013

BERGER & MONTAGUE, P.C.

By:_____
    Sherrie R. Savett (PA I.D. #17646)
    Russell D. Paul (PA I.D. #71220)
    Joy P. Clairmont (PA I.D. #82775)
    1622 Locust Street
    Philadelphia, PA  19103
    Tel: (215) 875-3000
    Fax: (215) 875-4636

Kal6204500

73

Attachment A:
UHS Behavioral Health Centers

| | |
|---|---|
| Adolescent Substance Abuse Program<br>Fort Walton Beach, FL | Alabama Clinical Schools<br>Birmingham, AL |
| Alhambra Hospital<br>Rosemead, CA | Alliance Health Center<br>Meridian, MS |
| Anchor Hospital<br>Atlanta, GA | Arbour - Fuller Hospital<br>South Attleboro, MA |
| Arbour - HRI Hospital<br>Brookline, MA | Arbour Counseling Services<br>Rockland, MA |
| Arbour Hospital<br>Boston, MA | Arbour Senior Care<br>Rockland, MA |
| Arrowhead Behavioral Health<br>Maumee, OH | Atlantic Shores Hospital<br>Fort Lauderdale, FL |
| Aurora Pavilion Behavioral Health Services<br>Aiken, SC | Austin Lakes Hospital<br>Austin, TX |
| Austin Oaks Hospital<br>Austin, TX | Behavioral Hospital of Bellaire<br>Houston, TX |
| Belmont Pines Hospital<br>Youngstown, OH | Benchmark Behavioral Health Services<br>Woods Cross, UT |
| Bloomington Meadows Hospital<br>Bloomington, IN | Boulder Creek Academy<br>Bonners Ferry, ID |
| Brentwood Behavioral Healthcare of<br>Mississippi<br>Flowood, MS | Brentwood Hospital<br>Shreveport, LA |
| Bristol Youth Academy<br>Bristol, FL | Brooke Glen Behavioral Health<br>Fort Washington, PA |
| Brynn Marr Hospital<br>Jacksonville, NC | Calvary Center<br>Phoenix, AZ |

| | |
|---|---|
| Canyon Ridge Hospital<br>Chino, CA | Cedar Grove Treatment Center<br>Murfreesboro, TN |
| Cedar Hills Hospital<br>Beaverton, OR | Cedar Ridge Hospital<br>Oklahoma City, OK |
| Cedar Ridge Residential Treatment Center<br>Oklahoma City, OK | Cedar Springs Behavioral Health Services<br>Colorado Springs, CO |
| Centennial Peaks Hospital<br>Louisville, CO | Center For Change<br>Orem, UT |
| Central Florida Behavioral Hospital<br>Orlando, FL | Chicago Children's Center<br>Chicago, IL |
| Clarion Psychiatric Center<br>Clarion, PA | Coastal Behavioral Health<br>Savannah, GA |
| Coastal Harbor Treatment Center<br>Savannah, GA | Columbus Behavioral Center<br>Columbus, IN |
| Compass Intervention Center<br>Memphis, TN | Copper Hills Youth Center<br>West Jordan, UT |
| Cottonwood Treatment Center<br>So. Salt Lake, UT | Crescent Pines Hospital<br>Stockbridge, GA |
| Cumberland Hall Hospital<br>Hopkinsville, KY | Cumberland Hospital<br>New Kent, VA |
| Cypress Creek Hospital<br>Houston, TX | Del Amo Hospital<br>Torrance, CA |
| Diamond Grove Center<br>Louisville, MS | Dover Behavioral Health System<br>Dover, DE |
| Emerald Coast Behavioral Hospital<br>Panama City, FL | Fairfax Hospital<br>Kirkland, WA |
| Fairmount Behavioral Health System<br>Philadelphia, PA | FHCHS of Puerto Rico<br>San Juan, PR |
| Fieldston Preparatory School<br>Titusville, FL | First Home Care - VA<br>Portsmouth, VA |

| | |
|---|---|
| Forest View Hospital<br>Grand Rapids, MI | Fort Lauderdale Hospital<br>Fort Lauderdale, FL |
| Foundations Behavioral Health<br>Doylestown, PA | Foundations for Living<br>Mansfield, OH |
| Fox Run Center for Children and Adolescents<br>St. Clairsville, OH | Fremont Hospital<br>Fremont, CA |
| Friends Hospital<br>Philadelphia, PA | Garfield Park Hospital<br>Chicago, IL |
| Glen Oaks Hospital<br>Greenville, TX | Good Samaritan Counseling Center<br>Anchorage, AK |
| Gulf Coast Treatment Center<br>Fort Walton Beach, FL | Gulf Coast Youth Academy<br>Fort Walton Beach, FL |
| Hampton Behavioral Health Center<br>Westampton, NJ | Harbor Point Behavioral Health Center<br>Portsmouth, VA |
| Hartgrove Hospital<br>Chicago, IL | Havenwyck Hospital<br>Auburn Hills, MI |
| Heartland Behavioral Health Services<br>Nevada, MO | Heritage Oaks Hospital<br>Sacramento, CA |
| Hermitage Hall<br>Nashville, TN | Hickory Trail Hospital<br>DeSoto, TX |
| High Point Treatment Center<br>Cooper City, FL | Highlands Behavioral Health<br>Littleton, CO |
| Hill Crest Behavioral Health Services<br>Birmingham, AL | Holly Hill Hospital<br>Raleigh, NC |
| Horace Mann Academy<br>Rockledge, FL | Horizon Health Management<br>Lewisville, TX |
| Intermountain Hospital<br>Boise, ID | Kempsville Center for Behavioral Health<br>Norfolk, VA |
| Keystone Center<br>Wallingford, PA | Kingwood Pines Hospital<br>Kingwood, TX |

| | |
|---|---|
| La Amistad Behavioral Health - Adult Program<br>Winter Park, FL | La Amistad Behavioral Health Services<br>Maitland, FL |
| Lake Bridge Behavioral Health<br>Macon, GA | Lakeside Behavioral Health System<br>Memphis, TN |
| Laurel Heights Hospital<br>Atlanta, GA | Laurel Oaks Behavioral Health Center<br>Dothan, AL |
| Laurel Ridge Treatment Center<br>San Antonio, TX | Liberty Point Behavioral Healthcare<br>Staunton, VA |
| Lighthouse Care Center of Augusta<br>Augusta, GA | Lighthouse Care Center of Conway<br>Conway, SC |
| Lincoln Prairie Behavioral Health Center<br>Springfield, IL | Lincoln Trail Behavioral Health System<br>Radcliff, KY |
| Manatee Palms Youth Services<br>Bradenton, FL | Mayhill Hospital<br>Denton, TX |
| McDowell Center for Children<br>Dyersburg, TN | Meridell Achievement Center<br>Liberty Hill, TX |
| Mesilla Valley Hospital<br>LasCruces, NM | Michiana Behavioral Health Center<br>Plymouth, IN |
| Midwest Center for Youth and Families<br>Kouts, IN | Millwood Hospital<br>Arlington, TX |
| Milton Girls Juvenile Residential Facility<br>Milton, FL | Mountain Youth Academy<br>Mountain City, TN |
| Natchez Trace Youth Academy<br>Waverly, TN | NDA Behavioral Health System<br>Mt. Dora, FL |
| Newport News Behavioral Health Center<br>Newport News, VA | North Spring Behavioral Healthcare<br>Leesburg, VA |
| North Star Behavioral Health System - Debarr<br>Anchorage, AK | North Star Hospital<br>Anchorage, AK |
| Northwest Academy<br>Naples, ID | NorthWest Academy<br>Streamwood, IL |

| | |
|---|---|
| Oak Plains Academy<br>Ashland City, TN | Okaloosa Youth Academy<br>Crestview, FL |
| Okaloosa Youth Development Center<br>Crestview, FL | Old Vineyard Behavioral Health Services<br>Winston-Salem, NC |
| Palmetto Behavioral Health - Pee Dee<br>Florence, SC | Palmetto Behavioral Health - Summerville<br>Summerville, SC |
| Palmetto Lowcountry Behavioral Health<br>North Charleston, SC | Panamericano (Cidra)<br>Cidra, PR |
| Parkwood Behavioral Health System<br>Olive Branch, MS | Peachford Hospital<br>Atlanta, GA |
| Pembroke Hospital<br>Pembroke, MA | Pinnacle Pointe<br>Little Rock, AR |
| Poplar Springs Hospital<br>Petersburg, VA | Prairie St. Johns<br>Fargo, ND |
| Pride Institute<br>Eden Prairie, MN | Professional Probation Services<br>Norcross, GA |
| Provo Canyon Behavioral Hospital<br>Orem, UT | Provo Canyon School<br>Provo, UT |
| Provo Canyon School - Springville Campus<br>Springville, UT | Rivendell Behavioral Health Services<br>Bowling Green, KY |
| Rivendell Behavioral Health Services of<br>Arkansas  Benton, AR | River Crest Hospital<br>San Angelo, TX |
| River Oaks Hospital<br>New Orleans, LA | River Park Hospital<br>Huntington, WV |
| River Point Behavioral Health<br>Jacksonville, FL | Riverdale Country School<br>Palm Bay, FL |
| Riveredge Hospital<br>Forest Park, IL | Rock River Academy<br>Rockford, IL |
| Rockford Center<br>Newark, DE | Rolling Hills Hospital<br>Franklin, TN |

| | |
|---|---|
| Roxbury Treatment Center<br>Shippensburg, PA | Salt Lake Behavioral Health<br>Salt Lake City, UT |
| San Marcos Treatment Center<br>San Marcos, TX | SandyPines<br>Tequesta, FL |
| Schick Shadel Hospital<br>Seattle, WA | Shadow Mountain Behavioral Health System<br>Tulsa, OK |
| Shadow Mountain Riverside<br>Tulsa, OK | Sierra Vista Hospital<br>Sacramento, CA |
| South Texas Behavioral Health System<br>Edinburg, TX | Spring Mountain Sahara<br>Las Vegas, NV |
| Spring Mountain Treatment Center<br>Las Vegas, NV | Springwoods Behavioral Health<br>Fayetteville, AR |
| St. Louis Behavioral Medicine Institute<br>St. Louis, MO | St. Simons By-The-Sea<br>St. Simons Island, GA |
| Stonington Institute<br>North Stonington, CT | Streamwood Behavioral Healthcare System<br>Streamwood, IL |
| Summit Oaks Hospital<br>Summit, NJ | Summit Ridge Hospital<br>Lawrenceville, GA |
| Talbott Recovery Campus<br>Atlanta, GA | Texas NeuroRehab Center<br>Austin, TX |
| The BridgeWay<br>North Little Rock, AR | The Brook - Dupont<br>Louisville, KY |
| The Brook - KMI<br>Louisville, KY | The Carolina Center for Behavioral Health<br>Greer, SC |
| The Horsham Clinic<br>Ambler, PA | The Hughes Center<br>Danville, VA |
| The Meadows Hospital / Universal Community<br>Behavioral Health<br>Centre Hall, PA | The Pavilion at Northwest Texas<br>Amarillo, TX |
| The Pavilion Foundation<br>Champaign, IL | The Recovery Center<br>Wichita Falls, TX |

| | |
|---|---|
| The Ridge Behavioral Health System<br>Lexington, KY | The Vines Hospital<br>Ocala, FL |
| Three Rivers Behavioral Health  West<br>Columbia, SC | Three Rivers Residential Treatment - Midlands<br>Columbia, SC |
| Timberlawn Mental Health System<br>Dallas, TX | TMC Behavioral Health Center<br>Sherman, TX |
| Turning Point Hospital<br>Moultrie, GA | Turning Point Youth Center<br>St. John's, MI |
| Two Rivers Psychiatric Hospital<br>Kansas City, MO | University Behavioral Center<br>Orlando, FL |
| University Behavioral Health of Denton<br>Denton, TX | University Behavioral Health of El Paso<br>El Paso, TX |
| Upper East Tennessee Regional Juvenile<br>Detention Center<br>Johnson City, TN | Valle Vista Health System<br>Greenwood, IN |
| Valley Hospital<br>Phoenix, AZ | Virgin Islands Behavioral Services<br>St. Croix, VI |
| Virginia Beach Psychiatric Center<br>Virginia Beach, VA | Walton Youth Development Center De Funiak<br>Spring. FL |
| Wekiva Springs Hospital<br>Jacksonville, FL | Wellstone Regional Hospital<br>Jefferson, IN |
| West Hills Hospital<br>Reno, NV | West Oaks Hospital<br>Houston, TX |
| Westwood Lodge<br>Westwood, MA | Willow Springs Center<br>Reno, NV |
| Windmoor Healthcare<br>Clearwater, FL | Windsor-Laurelwood Center<br>Willoughby, OH |
| Wyoming Behavioral Institute<br>Casper, WY | |

## CERTIFICATE OF SERVICE

I hereby certify that on November 6, 2013 a true and correct copy of the Relator's Complaint Pursuant to the Federal False Claims Act, 31 U.S.C. §§3729 et seq. and Pendent State False Claims Acts was served on the following via certified mail.

Hon. Eric H. Holder, Jr.
Attorney General
United States Department of Justice
950 Pennsylvania Avenue, N.W.
Washington, D.C. 20530-0001

Kamala D. Harris
Attorney General
Office of the Attorney General
1300 "I" Street, Suite 1740
Sacramento, CA 95814

Robert Ferguson
Attorney General
1125 Washington Street, SE
P.O. Box 40100
Olympia, WA 98504-0100

George Jepsen, Attorney General
55 Elm Street
P.O. Box 120
Hartford, CT 06141-0120

Joseph R. "Beau" Biden, III
Attorney General
Carvel State Office Building
820 N. French Street
Wilmington, DE 19801

Margaret Hutchinson, Chief
U.S. Attorney's Office – Civil Division
615 Chestnut Street
Philadelphia, PA 19106

Pam Bondi, Attorney General
State of Florida
The Capitol PL-01
Tallahassee, FL 32399-1050

Jeff Atwater
Chief Financial Officer
Florida Dept. Of Financial Services
200 East Gaines Street
Tallahassee, FL 32399-0300

Sam Olens
Attorney General
40 Capitol Square SW
Atlanta, GA 30334-1300

Lisa Madigan
Attorney General
James R. Thompson Ctr.
100 W. Randolph Street
Chicago, IL 60601

Greg Zoeller
Attorney General
Indiana Government Center South
302 W. Washington Street, 5th Fl.
Indianapolis, IN 46204

John Suthers
Ralph L. Carr Colorado Judicial Center
1300 Broadway, 10th Fl.
Denver, CO 80203

James D. Caldwell
Attorney General
P.O. Box 94095
Baton Rouge, LA  70804-4095

Martha Coakley
Attorney General
One Ashburton Place
Boston, MA 02108-1698

Bill Schuette
Attorney General
525 W. Ottawa Street
P.O. Box 30212
Lansing, MI  48908-0212

Robert E. Cooper, Jr.
Attorney General
425 5th Avenue North
Nashville, TN  37243

Roy Cooper
Attorney General
Department of Justice
P.O. Box 629
Raleigh, NC  27602-0629

John Jay Hoffman
Acting Attorney General
Richard J. Hughes Justice Complex
25 Market Street
P.O. Box 080
Trenton, NJ  08625

Gary King
Attorney General
State of New Mexico
P.O. Drawer 1508
Santa Fe, NM  87504-1508

Catherine Cortez Masto
Attorney General
Office of the Attorney General
Old Supreme Ct. Building
100 North Carson Street
Carson City, NV 89701

Scott Pruitt
Attorney General
313 N.E. 21st Street
Oklahoma City, OK  73105

Gregg Abbott, Attorney General
Office of the Attorney General
Capitol Station
P.O. Box 12548
Austin, TX 78711-2548

Ken Cuccinelli
Attorney General
Office of the Attorney General
900 East Main Street
Richmond, VA 23219

Sidonie Squier
Cabinet Secretary
New Mexico Human
Services Department
Office of the Secretary
P.O. Box 2348
Santa Fe, NM  87504

Joy P. Clairmont